(No. 61821.—
(No. 61822.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JERRY MAHAFFEY, Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. REGINALD MAHAFFEY, Appellant.

*Opinion filed April 20, 1989.—Rehearing denied June 28, 1989.*

Paul P. Biebel, Jr., and Randolph N. Stone, Public Defenders, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Kenneth T. McCurry, Kevin Sweeney, Renee G. Goldfarb and Inge Fryklund, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE MORAN delivered the opinion of the court:

Defendants, Jerry Mahaffey (Jerry) and Reginald Mahaffey (Reginald), were indicted by a Cook County grand jury for the murders of Dean and Jo Ellen Pueschel, and the attempted murder of Richard Pueschel. Defendants were charged as follows in connection with the deaths of Dean and Jo Ellen Pueschel: intentional murder, knowing murder, and felony murder based on residential burglary, home invasion and armed robbery (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (a)(2) (respectively)); residential burglary based on theft and armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 19—3); home invasion (Ill. Rev. Stat. 1981, ch. 38, par. 12—11(a)(2)); armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—2(a)); armed violence premised on knowing murder (Ill. Rev. Stat. 1981, ch. 38, par. 33A—2); and theft (Ill. Rev. Stat. 1981, ch.

38, par. 16—1(a)). In connection with the death of Jo Ellen Pueschel, defendants were also charged with felony murder based on rape and deviate sexual assault (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(3)); rape (Ill. Rev. Stat. 1981, ch. 38, par. 11—1(a)); deviate sexual assault (Ill. Rev. Stat. 1981, ch. 38, par. 11—3(a)); and armed violence premised on rape and deviate sexual assault (Ill. Rev. Stat. 1981, ch. 38, par. 33A—2). In connection with the assault on Richard Pueschel, defendants were charged as follows: attempted murder (Ill. Rev. Stat. 1981, ch. 38, par. 8—4); aggravated battery (Ill. Rev. Stat. 1981, ch. 38, par. 12—4(a)); aggravated battery premised on use of a deadly weapon (Ill. Rev. Stat. 1981, ch. 38, par. 12—4(b)(1)); aggravated battery of a child (Ill. Rev. Stat. 1981, ch. 38, par. 12—4.3(a)); home invasion (Ill. Rev. Stat. 1981, ch. 38, par. 12—11(a)(2)); armed violence based on attempted murder (Ill. Rev. Stat. 1981, ch. 38, par. 33A—2); and armed violence premised on aggravated battery (Ill. Rev. Stat. 1981, ch. 38, par. 33A—2). All of the armed violence counts were dismissed on the State's motion. The defendants were tried jointly before the same jury on each of the remaining counts. At the conclusion of the State's case in chief, the trial court granted Jerry's motion for a directed verdict on the deviate sexual assault charge. At the conclusion of all of the evidence, the jury found Reginald not guilty of deviate sexual assault, but found both defendants guilty of all remaining charges. The State requested a hearing to consider whether the death penalty should be imposed. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(d).) The jury which convicted the defendants also sat at the sentencing phase. The jury found defendants eligible for the death penalty, and found there were no mitigating factors sufficient to preclude imposition of the death penalty. The defendants' death sentences were stayed (107 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603). This

court consolidated the defendants' appeals after oral arguments in these cases.

On April 30, 1986, while defendants' appeals were pending in this court, the United States Supreme Court filed its opinion in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. The Court held that a defendant may rely solely on evidence concerning the selection of the jury at his own trial to establish that a prosecutor has unconstitutionally exercised peremptory challenges against potential jurors solely on account of race. (*Batson*, 476 U.S. at 95, 90 L. Ed. 2d at 87, 106 S. Ct. at 1722.) The court subsequently held that *Batson* was retroactively applicable to all cases pending on direct review when the decision was announced. *Griffith v. Kentucky* (1987), 479 U.S. 314, 328, 93 L. Ed. 2d 649, 661, 107 S. Ct. 708, 716.

In light of the *Batson* and *Griffith* decisions, this court issued supervisory orders in these cases on October 26, 1987. In those orders, we retained jurisdiction of these causes and directed the trial court to conduct an expedited hearing to permit the defendants to present evidence to substantiate their claim of unconstitutional discrimination in the exercise of peremptory challenges. Our supervisory order also stated that if the trial court found that a *prima facie* showing of such discrimination had been made, it should then determine whether or not there is a neutral explanation by the State for the exercise of the questioned peremptory challenges. The court conducted the hearing on November 30, 1987, and found that defendants had failed to establish a *prima facie* case of discrimination.

On return of the cases to this court, defendants raise numerous issues alleging errors at all stages of the proceedings. The issues we must address as to Jerry are: (1) whether the trial court erred in finding that Jerry failed to establish a *prima facie* case of discrimination under *Batson*; (2) whether the trial court erred in excusing a venireman for cause without further inquiry into her

sentiments regarding the death penalty; (3) whether the trial court erred in admitting Richard Pueschel's in-court identification of Jerry as one of the perpetrators of the crimes; (4) whether a comment made by Jo Ellen Pueschel's mother from the gallery during the redirect examination of Reginald denied Jerry a fair trial and a fair sentencing hearing; (5) whether some of the prosecutor's remarks during trial and closing argument had the effect of shifting the burden of proof to Jerry and undermined the presumption of his innocence; (6) whether the State failed to prove the *corpus delicti* of the rape; (7) whether the prosecutor's remarks during the sentencing phase sought to minimize the jury's responsibility for determining the appropriateness of death, in violation of *Caldwell v. Mississippi* (1985), 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633; (8) whether the trial court erred in refusing to instruct the jury that if it failed to sentence Jerry to death, the court would sentence him to a term of natural life; (9) whether the trial court erred in holding a joint death penalty hearing; and (10) whether Jerry's death sentence is excessive given his "light criminal background." Jerry also asks that we reconsider our prior cases upholding the constitutionality of the Illinois death penalty statute.

Reginald raises the same issues as does Jerry. Reginald raises four additional issues: (1) whether the trial court erred in failing to grant a severance because the admission of Jerry's confession implicating Reginald in the crimes denied him his right to confront witnesses; (2) whether the trial court erred in finding Reginald fit to proceed at trial without requiring a full examination of him; (3) whether the trial court erred in admitting a medical record as past recollection recorded during his pretrial suppression hearing; and (4) whether the trial court erred in denying Reginald's motion to quash his arrest and suppress evidence. Because we hold that the trial court erred in failing to grant a severance, and conclude that Reginald's case must be remanded for a new

trial, we need not address the other issues raised in his brief. We therefore limit our recitation of the testimony introduced at the guilt and sentencing phases to only those facts which are relevant to the issues raised by Jerry.

The record reveals that on the morning of August 29, 1983, Joseph Heinrich found the dead bodies of his daughter, Jo Ellen Pueschel, and his son-in-law, Dean Pueschel, in the Pueschel home. Mr. Heinrich found his grandson, Richard Pueschel, severely beaten and wandering near the alley by the family home. Several items were missing from the Pueschel home, including: a .357 Magnum revolver; a Zenith video recorder and several videotapes; an Atari video game console and seven game cartridges; several items of jewelry belonging to all three victims; and the Pueschels' 1982 red Chevrolet Camaro.

Eleven-year-old Richard Pueschel testified that during the late evening of August 28, or the early morning of August 29, 1983, he awoke to find himself in a headlock. He heard two separate voices tell him to "shut up and be cool." Richard further testified that he either fell back asleep or was knocked out, and later woke up and walked into the kitchen "in a daze." Once in the kitchen, he was told to lie on the floor next to his mother. Richard testified that while he was lying on the floor, he could see his mother lying on the floor next to him out of the corner of his eye. He stated that he could see she was being struck. He could not remember what happened to him at that time. At the conclusion of his direct testimony, Richard identified both defendants as being the two men who were in his home that night. On cross-examination, Richard admitted that he had been unable to identify the defendants in a line-up conducted while he was being hospitalized for his wounds, and denied having seen the defendants' pictures in the newspaper. Richard further testified that he had described the assailants to Detective Ryan of the Chicago police depart-

ment. He described one assailant as being 5 feet 10 inches to 5 feet 11 inches in height, medium build, weighing between 160 to 180 pounds, wearing a medium afro, possibly having a scar on his left cheek. He described the other assailant as being 5 feet 9 inches or 5 feet 10 inches in height, "skinny" build, weighing between 150 to 170 pounds, wearing his hair in a short afro and having a short mustache. He denied giving any other description to the police.

Chicago police Detective Anthony Graffeo testified that his investigation of these crimes began at the Pueschel home on the morning of August 29, 1983. Detective Graffeo acknowledged that his report concerning the incident contained a description of the assailants which differed from the description Richard gave to Detective Ryan. Detective Graffeo's report indicated that one assailant was a 25- to 30-year-old black male, 6 feet 2 inches in height, 210 pounds, with a "scraggly" beard and wearing a white shirt. The second assailant was described in the report as being a light-complected black or Latino male, approximately 25 to 30 years of age, 5 feet 4 inches to 5 feet 6 inches in height, weighing 125 pounds and wearing dark clothing. Detective Graffeo stated that his report was based upon a canvass of residents of the apartment building in which the Pueschels resided.

Sergeant Frank Piercezynski of the Chicago police department testified that while on duty on August 30, 1983, he discovered a 1982 red Chevrolet Camaro in a parking lot at 2245 West Lake Street. The automobile was later identified as belonging to the Pueschels.

Sergeant John Byrne of the Chicago police department testified that at approximately 2 a.m. on September 2, 1983, he met with one of defendants' brothers, Cedric Mahaffey. Based on the information received from Cedric, the Chicago police arrested defendants and seized from their residences certain property which belonged to the Pueschels. The property seized from Jer-

ry's residence included the Zenith video recorder and the Atari video game console and game cartridges. The property recovered from Reginald's apartment included the .357 Magnum revolver and 24 pieces of jewelry. Sergeant Byrne also testified that Reginald removed a man's ring from his hand and a watch from his back pocket after he was arrested. The ring and the watch were later identified at trial as also belonging to Dean Pueschel.

Sergeant Byrne admitted on cross-examination that despite Cedric Mahaffey's knowledge of facts concerning the crimes which were unknown to the general public, he was never arrested nor were his fingerprints compared to those found in the Pueschel home. Sergeant Byrne also admitted that Cedric Mahaffey is a light-complected black male.

Upon further cross-examination, Reginald's counsel inquired into certain statements Cedric Mahaffey made to Sergeant Byrne. Based upon this line of questioning, the State was allowed, over defense counsel's objection, to inquire on redirect examination into the substance of the conversation Sergeant-Byrne had with Cedric Mahaffey.

After the trial court orally instructed the jury to consider the testimony in determining the guilt or innocence of Reginald, Sergeant Byrne testified in substance as follows. He and Detective Charles Grunhard met with Cedric Mahaffey, who told them that "he knew who committed a double murder on the north side of Chicago a couple of days earlier." When asked who had committed the murders, Cedric told the officers that he did not want to tell them who they were until he could be sure of their involvement. Cedric then asked the officers whether any guns were taken. After Sergeant Byrne told him that there were guns taken in the incident, Cedric went on to correctly describe to Sergeant Byrne the guns that were taken in the incident.

Cedric then told Sergeant Byrne that he would not tell him the names of the men who committed the murders but that he would tell him where they lived. Cedric then retrieved a video cassette tape of the film "Papillon" from the trunk of his car, and told Sergeant Byrne that the tape had been taken from the victims' home. Cedric then described how he obtained the tape.

On Thursday, September 1, 1983, at 7 o'clock in the evening, Cedric received a telephone call from a "friend" who asked him to go to the "west side to help him move some stuff." An hour later, he drove with his friend and another person to an apartment on the west side, where he helped them load video equipment and video cassettes into the car. Cedric also saw a .357 Magnum and a 12-gauge shotgun in the apartment.

Cedric and the friend then drove to a location on the south side and carried the items into a house. While carrying the items into the house, the friend told Cedric that "he and the other friend got these items committing a burglary, and that they had to kill a couple of people." Upon hearing this, Cedric removed the videotape from the box he was carrying in order to show the police. When Cedric asked his friend if he was kidding, the friend said, "No[,] [w]e killed a couple of people on the north side and a little boy lived." When Sergeant Byrne asked who the people were who had committed the murder, Cedric told him their names were Reginald and Jerry, and that they were his brothers.

Cedric then began to relate more of the conversation he had had with one of his brothers regarding the crimes. From the conversation, Cedric learned that Reginald and Jerry had gone to the north side to commit a burglary, but that the van they were driving "broke down." They left the van and crawled through an open window and found a boy asleep. They beat the boy and then went into another room and found a man and a woman. They beat the man and the woman and then had sex with the woman. They removed several items from

the house, loading them into the car "that was in the driveway."

Cedric stated that the Tuesday following the crimes, Jerry went to Reginald's house where they divided up the property. Jerry took the rifle, the Atari game and the video recorder, and took them to his brother Terry's apartment. The day before he was arrested, Jerry retrieved the property from Terry's apartment and brought it to his house.

Cedric told Sergeant Byrne that the .357 Magnum and the shotgun would be found where Reginald was staying. Cedric also told Sergeant Byrne that the video equipment and cassettes would be found in Jerry's apartment and the carbine would be found in his brother Terry's apartment.

Assistant State's Attorney Irv Miller testified that both defendants gave statements, each of them admitting complicity in the crimes and implicating the other as well. Over defense counsel's objections, the statements were read to the jury without redacting them to exclude references to the nondeclaring defendant. The jury was instructed that each defendant's statement should only be considered as evidence against the person making the statement.

The substance of Jerry's statement is as follows. On August 29, 1983, Jerry and his brother, Reginald, had discussed committing a burglary on the "north side." Both he and Reginald drove to the corner of Howard and Western Streets, where they were going to burglarize a clothing store. However, Jerry saw a "paddy wagon" in an alley, so Reginald drove the van around the block and parked in a hospital parking lot. After they decided not to burglarize the store, they attempted to start the van but were unable to do so because the battery was "dead." Jerry and Reginald left the van and started walking toward an alley. Seeing an open window, Reginald removed the screen and Jerry entered the apartment with Reginald following behind him.

The room they first entered was the bathroom. They proceeded out of the bathroom and into the "grown-ups room" and then the "boy's room." Both men then entered the kitchen where Reginald picked up a knife. Jerry wiped everything Reginald touched "for not finding fingerprints." They both proceeded into the "little boy's room." Jerry approached the child and tried to strangle him with a towel. They then put a pillow over his head and Reginald stabbed him four to five times. As the boy continued to struggle, Jerry hit the boy over the head with a baseball bat he had found in the boy's room.

Reginald and Jerry each took a baseball bat from the boy's room, and entered another room where they found two people lying in bed. Reginald stood on the left side of the bed next to the woman. Jerry stood on the right side of the bed next to the man. They both proceeded to hit the man on the head with the baseball bats. Reginald took the woman into another room where he forced her to perform fellatio and have vaginal intercourse with him. Jerry went into the room where Reginald and the woman were, but returned to the room in which the man lay and "saw the man pulling a pistol out." Jerry hit the man over the head with the baseball bat and returned to the living room. Reginald asked the woman where the other guns were, to which the woman replied, "there [were] more above the dresser on the wall." Jerry and Reginald went back into the bedroom in which the man lay to retrieve the weapons. Jerry was unable to remove a "pump and [a] thirty-thirty" because they were locked in a rack on the wall. However, Reginald was successful in removing a shotgun. During this time, the man began to move, and Reginald stabbed him four to five times in the chest and side.

Reginald asked the woman for the keys to her car. The woman accompanied Reginald out to the car so she could turn off the car alarm. He and the woman went back into the house, and he began to load several items from the house into the car.

Jerry then identified the items seized from his residence as well as his brother's residence as being the items taken from the home they had burglarized. These items included a shotgun, a rifle, three boxes of ammunition, a box of "tapes," an "arcade game" and several items of jewelry.

After loading the items into the car, Jerry went back into the house and told the woman to lie down. The boy then said "Ma-ma, Ma-ma," after which she and the boy lay down. Reginald struck her on the head several times with a pistol, causing her death.

Reginald and Jerry drove the car to Reginald's house, where they left the property taken from the home. They then abandoned the car at the Henry Horner projects.

While Reginald's statement corroborated Jerry's statement in many respects, there were differences. For example, Jerry stated that the plan to burglarize the clothing store was abandoned because they saw a police wagon while Reginald claimed it was abandoned because of the traffic. Jerry stated that he followed behind Reginald and wiped his fingerprints from every item he touched, a fact not mentioned in Reginald's statement. Reginald stated that he had vaginal intercourse with the woman, and that he saw the woman performing fellatio on Jerry. Jerry also stated that Reginald had vaginal intercourse with the woman. However, he did not state that the woman performed fellatio on him. Rather, he stated that the woman performed fellatio on Reginald. Reginald claimed that Jerry stabbed the boy while Jerry said that Reginald committed the stabbing. Jerry also claimed that Reginald stabbed the man four to five times while Reginald failed to mention the stabbing in his statement. Jerry stated that as the woman lay on the kitchen floor Reginald hit her over the head with the revolver. In contrast, Reginald stated that as he left the house, he could hear "solid hits" which "told him [that Jerry] was finishing the lady and her son off with the bats."

Expert testimony regarding the physical evidence discovered at the scene indicated that several of the fingerprints found matched those of Dean and Jo Ellen Pueschel. None of the prints found at the scene matched either of the defendants' finger or palm prints. However, testimony further indicated that the finger or palm prints of Richard Pueschel and Cedric Mahaffey were never submitted for comparison. The testimony also indicated that the vaginal swab taken from Jo Ellen Pueschel tested positive for the presence of sperm, and that her vagina was "widely patent," but did not show signs of abrasions or trauma. The expert who examined the vaginal swab was unable to determine when intercourse had occurred. Moreover, the expert could not determine the assailant's blood type because the swab did not reveal the presence of "ABO blood substance."

Defendant Jerry Mahaffey's theory at trial was that the police had beaten him and extracted a false confession from him. He contended that he had rehearsed his statement with the police and the assistant State's Attorney prior to the arrival of the court reporter. Jerry also asserted that the lack of identification and physical evidence linking him to the crime created a reasonable doubt as to his guilt. Defendant Reginald Mahaffey's defense at trial echoed Jerry's. In addition, Reginald asserted that Cedric Mahaffey's intimate knowledge of the crimes demonstrated that he was the person who had committed them. Reginald testified in his own behalf, denying that he had committed the crimes for which he was charged. He at first denied that the Pueschels' property had been recovered from his residence. However, Reginald stated later that he purchased the TV, jewelry and guns from a man who visited the apartment shortly before he was arrested.

The jury found both of the defendants guilty of murder, attempted murder, home invasion, rape, armed robbery, residential burglary, aggravated battery and theft. Reginald was found not guilty of deviate sexual assault.

The State then moved for a death penalty hearing. As previously noted, our recitation of the evidence introduced at the sentencing hearing will be limited to the evidence concerning the sentencing of Jerry only.

The State presented evidence concerning a prison escape in which Jerry participated while he was incarcerated awaiting trial. Vernon Williams, a Cook County correctional officer, testified that on March 23, 1984, at approximately 9 p.m., Reginald, armed with a gun, entered the prison security office with another inmate who was dressed in an officer's uniform. Pointing the gun at Officer Williams, Reginald told the officer to lie on the floor. The witness testified that Jerry Mahaffey entered the office along with two other inmates, and that all of the prison employees present were told to lie on the floor. The witness further testified that as the inmates proceeded to remove some of the officer's uniform, Jerry took $650 from him. The witness indicated that Jerry was armed with a gun at that time. The record shows that Jerry successfully escaped but was recaptured two days later.

The State also introduced into evidence certified copies of Jerry's prior convictions. The record shows that defendant was convicted of robbery in 1974, 1976 and 1981. His record also contains convictions on two counts of theft and one count of retail theft, all in 1980.

In mitigation, Jerry's mother, Myrtis Mahaffey, testified that she had raised the family alone in the Chicago housing projects, where violence and gang fights were common. She described Jerry as a "fun-loving" person, and said that she loved him and would miss him when asked how his death would affect her.

Jerry testified in his own behalf stating that he had a wife and two children whom he had tried to support by working in a bowling alley as a janitor. He also stated that he wanted to live. Over objection of his counsel, the State questioned him regarding his involvement in the crimes at issue. He denied being present in the Pueschel

home. When asked whether he would attempt to escape from prison again, Jerry replied, "I don't know."

Jerry's wife, Carol Mahaffey, testified that Jerry had a close relationship with his daughters. She also stated that she wanted Jerry to live to help support the family and she also wanted her newborn child to know her father.

The jury found Jerry to be over 18 years of age (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)) and also found that he had been convicted of two or more murders (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3)). Finally, the jury found that Jerry had been convicted of murdering someone during the commission of the felonies of armed robbery, rape, home invasion or residential burglary. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)(c).) The jury also found that there were no mitigating factors sufficient to preclude imposition of the death penalty.

The facts which are relevant to our resolution of Jerry's *Batson* claim are as follows. The record reveals that Jerry is black and the victims are white. During *voir dire*, the trial court noted the race of each venireman on their respective juror cards. Certified copies of the relevant juror cards have been included with the record on appeal. The State was given a total of 24 peremptory challenges; eight were exercised against white jurors and seven against black jurors. Jerry's counsel made a motion to dismiss the venire each time the State struck a black venireman from the jury, alleging that the State was improperly excluding blacks from the jury. At the conclusion of *voir dire*, he made another motion to dismiss the venire, alleging that the State had exercised its peremptory challenges to remove all seven black veniremen who remained after challenges for cause. He stated that one black juror had been accepted by the State as an alternate only after it had exhausted its peremptory challenges.

The trial court reviewed the relevant case law. Without citing to a particular case, the trial court stated that

it disagreed with a recent decision of this court which re-affirmed the pre-*Batson* rule that the State is not required to come forward with reasons for the exercise of its peremptory challenges, even where it is responsible for excusing a majority of the black veniremen from the venire. However, the court recognized that it could not require the State to come forward with reasons for the questioned challenges, although it invited the State to do so. The State declined the invitation. The trial court denied Jerry's motion to dismiss the venire.

At the *Batson* hearing held pursuant to our supervisory order, Jerry's appellate counsel made several arguments in support of his claim that he had established a *prima facie* case of discrimination under *Batson*. Counsel argued that the State intended to dismiss all of the black veniremen without seriously considering them for jury service. He asserted that this intent was demonstrated by the fact that the State made no special inquiry of the prospective black jurors during *voir dire*. He also emphasized that the State had removed all of the black veniremen who remained after challenges for cause, and that the State's action caused the trial court to ask the State to explain the reasons for its challenges. He concluded that these facts established a *prima facie* case of discrimination.

The State made several arguments in support of its position that defendant had failed to establish a *prima facie* case. First, the State noted that it had accepted a black woman as an alternate juror. The State further argued that it had exercised more challenges against white veniremen than black veniremen. Finally, the State gave its criteria for challenging the seven black veniremen, asserting that the criteria were applied to all veniremen, without regard to race.

The trial judge began his analysis by acknowledging that defendant is black, and that the judge may rely on the fact that "peremptory challenges constitute a jury selection practice that permits discrimination." The

judge then commented on his observations of the two assistant State's Attorneys who tried the case, Mr. Malatesta and Mr. Tsukuno. While admitting that he had not had much experience with Malatesta, he stated that as to Mr. Tsukuno:

> "I have had a lot of experience with Mr. Tsukuno, who represented the State in this courtroom for I believe better than a year, maybe even more. And he was what is known as the first chair in this courtroom, which meant that he was responsible for all of the cases and directed the assistants who were in this courtroom.
>
> * * *
>
> I have never found Mr. Tsukuno to be one who practiced any type of discrimination at all.
>
> * * *
>
> So in that respect I don't believe that this presumption that challenges can permit discrimination if they would wish to do so can fairly be a presumption that I can put up and compare against Mr. Tsukuno. He is not that type of person."

The court then went into a detailed analysis of the jurors whom the State struck from the jury, noting that the characteristics of the eight white jurors who were stricken from the jury were the same as the characteristics of the black jurors who were stricken from the jury. The court added that several of the white veniremen shared more than one characteristic with their fellow black veniremen. The court then compared the characteristics of the white and black veniremen the State struck from the jury. For example, the trial court noted that the State struck one white and one black teacher; one white tradesman and one black tradesman; one white writer and one black writer; one white draftsman and one black engineer; two white veniremen and one black venireman who had been accused of a crime; and five white veniremen and two black veniremen who had been victims of crimes. After considering all of the relevant circumstances, the trial court found that defendant

had failed to establish a *prima facie* case of discrimination.

The first issue we address is whether the trial court erred in failing to grant Reginald's motion for a severance. Reginald argues that the admission of Jerry's confession implicating him in the crimes denied him his right to confront witnesses. Jerry does not join in this argument because Reginald testified at trial and was subject to cross-examination concerning his statement implicating Jerry in the crimes.

Citing *Lee v. Illinois* (1986), 476 U.S. 530, 539, 90 L. Ed. 2d 514, 525, 106 S. Ct. 2056, 2061, the State argues that the presumptive unreliability of Jerry's confession was rebutted by sufficient indicia of reliability and trustworthiness to render it independently admissible against Reginald. The defendant in *Lee* was charged along with a codefendant, Thomas, with the commission of a double murder. (*Lee*, 476 U.S. at 531, 90 L. Ed. 2d at 520, 106 S. Ct. at 2057.) Neither defendant testified; however, the trial court expressly relied on Thomas' confession in determining Lee's guilt. On appeal, the Supreme Court was asked to decide whether the use of Thomas' confession at their joint trial violated Lee's rights under the sixth amendment confrontation clause as applied to the States through the fourteenth amendment. The court held that Thomas' confession did not bear sufficient indicia of reliability; therefore, the confession could not be used as substantive evidence against Lee. *Lee*, 476 U.S. at 546, 90 L. Ed. 2d at 530, 106 S. Ct. at 2065.

The Supreme Court began its analysis by stating that the circumstances surrounding Thomas' confession did not establish that the confession was reliable. The court noted that Thomas originally refused to talk to the police and only did so after he learned that Lee had implicated him in the murders and had urged him to share "the rap" with her. The Court further noted that the "statement was given in response to the questions of police, who, having already interrogated Lee, no doubt knew

what they were looking for, and the statement was not tested in any manner by contemporaneous cross-examination by counsel, or its equivalent." *Lee*, 476 U.S. at 544, 90 L. Ed. 2d at 528, 106 S. Ct. at 2064.

The Supreme Court also rejected the contention that Thomas' confession was reliable because it "interlocked" with Lee's on some points. The Court stated that the confession diverged in many respects, including Lee's role in the planning of one of the murders, the part she played in the facilitation of the other murder, "and certain factual circumstances relevant to the couple's premeditation." (*Lee*, 476 U.S. at 545-46, 90 L. Ed. 2d at 529, 106 S. Ct. at 2065.) Four justices dissented, stating that Thomas' statement was clearly against interest and did not attempt to shift the blame to Lee. (*Lee*, 476 U.S. at 553, 90 L. Ed. 2d at 534, 106 S. Ct. at 2069 (Blackmun, J., joined by Burger, C.J., Powell and Rehnquist, JJ., dissenting).) Finally, the dissent noted that Thomas' confession was corroborated not only by Lee's confession but also by the physical evidence introduced at trial, and concluded that these facts rendered the confession reliable. *Lee*, 476 U.S. at 554-57, 90 L. Ed. 2d at 535-37, 106 S. Ct. at 2069-71.

Here, the State does not argue that the circumstances surrounding Jerry's confession demonstrate that it bears sufficient indicia of reliability. The State relies instead on the purportedly "interlocking" nature of the confessions and testimony adduced at trial which it claims corroborates the confession.

The State essentially ignores the fact that in almost every instance, the confessions diverge on the question of who was responsible for the attacks on the Pueschels. Just as in *Lee*, these differences "go to the very issues in dispute at trial: the roles played by the two defendants in the" crimes for which they were charged. (*Lee*, 476 U.S. at 546, 90 L. Ed. 2d at 529, 106 S. Ct. at 2065.) For example, in his confession, Reginald claimed that Jerry stabbed the boy. Jerry stated in his confession

that Reginald was responsible for the stabbing. Both Reginald and Jerry stated that Reginald had vaginal intercourse with the woman. However, Reginald claimed that the woman performed fellatio on Jerry, while Jerry claimed the woman performed fellatio on Reginald. Reginald never mentioned stabbing the man. By contrast, Jerry claimed Reginald stabbed the man four to five times. Finally, Reginald stated that Jerry hit the woman on the head with a baseball bat as she lay on the kitchen floor. Jerry claimed that Reginald delivered the final blows with a revolver.

These discrepancies are not only significant but are the same kind of "buck-passing posturing" the *Lee* dissenters identified as the earmark of a truly unreliable confession. (*Lee*, 476 U.S. at 548, 90 L. Ed. 2d at 531, 106 S. Ct. at 2066 (Blackmun, J., joined by Burger, C.J., Powell and Rehnquist, JJ., dissenting).) We therefore find that under either the majority or the dissenting views expressed in *Lee*, Jerry's confession would be inadmissible as substantive evidence against Reginald. The fact that the jury was instructed not to consider Jerry's statement against Reginald or that Reginald's own confession was admitted against him does not cure this defect. *Cruz v. New York* (1987), 481 U.S. 186, 193-94, 95 L. Ed. 2d 162, 172, 107 S. Ct. 1714, 1719.

We also disagree with the State's argument that the error was harmless and did not affect the verdict. Jerry's statement implicated himself as well as Reginald in the crimes. Reginald's statement was similarly inculpatory, and mirrored Jerry's statement in many of its details. Both defendants attempted to demonstrate at trial that the inculpatory statements they made were coerced and involuntary. Because Reginald chose to testify, Jerry was able to cross-examine him regarding the part that coercion may have played in obtaining his confession. However, because Jerry did not testify, Reginald could not cross-examine him as to whether his confession was coerced or involuntary. Therefore, Reginald's claim of co-

ercion was undercut by his inability to confront Jerry regarding the accusations contained in his statement. Given this set of facts, Reginald's convictions must be reversed and the cause remanded for a new trial.

We now address the remaining issues raised by Jerry. The first issue he raises is whether the trial court's finding that he failed to establish a *prima facie* case of racial discrimination under *Batson* was erroneous.

As previously stated, the United States Supreme Court has held that the equal protection clause forbids a prosecutor from peremptorily challenging potential jurors solely on account of race or on the assumption that black jurors as a group will be unable to impartially consider the prosecutor's case against a black defendant. (*Batson v. Kentucky* (1986), 476 U.S. 79, 89, 90 L. Ed. 2d 69, 83, 106 S. Ct. 1712, 1719.) *Batson* requires that a defendant first establish a *prima facie* case of discrimination. (476 U.S. at 93-94, 90 L. Ed. 2d at 85-86, 106 S. Ct. at 1721.) Once the defendant establishes a *prima facie* case, the burden shifts to the prosecution to come forward with race-neutral reasons for striking the black veniremen. 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.

To establish a *prima facie* case, a defendant must first show that the prosecutor exercised his peremptory challenges to remove members of a cognizable racial group from the venire and that defendant is a member of that group. (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723.) The defendant may then "rely on the fact *** that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate,' " in demonstrating "that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723, quoting *Avery v. Georgia*

(1953), 345 U.S. 559, 562, 97 L. Ed. 1244, 1247-48, 73 S. Ct. 891, 892.

Jerry has met the first element of the *Batson* test for establishing a *prima facie* case of discrimination. Jerry is black and the State exercised peremptory challenges to remove from the venire certain members of his race. Therefore, the only question which remains is whether, considering "all relevant circumstances," he has established a *prima facie* case of discrimination. A trial court's determination that a defendant has failed to establish a *prima facie* case of discrimination will not be overturned unless it is against the manifest weight of the evidence. *People v. Evans* (1988), 125 Ill. 2d 50, 71.

The relevant circumstances a trial court may consider when determining whether a *prima facie* case of discrimination has been established include: a " 'pattern' of strikes against black" veniremen; "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges" (*Batson,* 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723); the disproportionate use of peremptory challenges against blacks; whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic; the level of black representation in the venire as compared to the jury; the race of the defendant and the victim; and the race of the witnesses (*Evans*, 125 Ill. 2d at 63-64). However, "the court must avoid arbitrarily deciding this delicate question solely from the number of blacks peremptorily challenged." *Evans*, 125 Ill. 2d at 64, citing *People v. Hooper* (1987), 118 Ill. 2d 244, 247-49 (Ryan, J., specially concurring).

Considering the circumstances in light of the actual facts of this case, we conclude that the trial court's finding that Jerry failed to establish a *prima facie* case of discrimination was not against the manifest weight of the evidence. Jerry does not contend that the State exercised a pattern of strikes against the black veniremen, nor does he contend that the excluded veniremen are as

heterogeneous as the community as a whole, sharing race as their only common characteristic. Indeed, as the trial court's thoughtful analysis demonstrates, the excluded veniremen shared many characteristics with their fellow veniremen.

Jerry's main assertion is that because the State excluded all seven black veniremen who remained after challenges for cause, and the court asked the State to offer explanations for those seven challenges, he has established a *prima facie* case. This argument assumes too much. Mere numbers do not establish a *prima facie* case of discrimination. (*Hooper*, 118 Ill. 2d at 247-49 (Ryan, J., specially concurring).) Furthermore, the fact that the trial court, relying on pre-*Batson* case law, invited the State to come forward with reasons for the questioned challenges does not establish a *prima facie* case. The court's comments merely demonstrate that it was under the same misapprehension as defendant; that a *prima facie* case of discrimination is demonstrated through mere numbers.

Jerry argues that the trial court's reliance on "apparent explanations" for the State's challenges demonstrates that the trial court "confused the [defendant's] duty to present a *prima facie* case *** and the prosecutor's duty to explain the challenges once a *prima facie* case is established." The record reveals, however, that rather than relying on "apparent explanations" for the State's challenges, the trial court merely reviewed the characteristics of the stricken jurors to determine their heterogeneity. This is a relevant circumstance which a trial court may consider when determining a *prima facie* case of discrimination. *Evans*, 125 Ill. 2d at 63-64.

Jerry also makes several related arguments which challenge the trial judge's consideration of his previous experience with Assistant State's Attorney Tsukuno. Jerry argues that the trial judge's consideration of Mr. Tsukuno's prior conduct in other cases "ignores settled law that a defendant may establish a case of racial dis-

crimination solely on the record of his own trial, without regard to a prosecutor's conduct in other cases"; the fact that Mr. Tsukuno is of Japanese-American heritage does not defeat the existence of a *prima facie* case; the trial court improperly discounted "the element of the *prima facie* case that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate"; and the trial court's "praise of the prosecutor" is irrelevant since Mr. Tsukuno's trial partner stated for the record the names of the jurors against whom the State exercised its peremptory challenges.

Jerry's arguments ignore the fact that trial judges "are familiar with local conditions and prosecutors, and can draw upon their power of observation and judicial experience as a guide in distinguishing a true case of discrimination from a false one." (*Evans*, 125 Ill. 2d at 67, citing *People v. Wheeler* (1978), 22 Cal. 3d 258, 281, 583 P.2d 748, 764, 148 Cal. Rptr. 890, 905.) By asserting that Mr. Malatesta stated for the record the names of the jurors whom the State peremptorily challenged, Jerry seems to suggest that Mr. Tsukuno played no part in *voir dire*. This assertion is not borne out by the record, which demonstrates that Mr. Tsukuno participated not only in *voir dire*, but in all proceedings from indictment through post-trial motions. The record shows that the trial judge used his experience, as well as his superior knowledge of local conditions and prosecutors, in determining that the State's peremptory challenges were not motivated by impermissible racial-group bias. We see no reason to disturb this finding.

Jerry next contends that the trial court erred in excusing a venireman for cause without further inquiry into her feelings regarding the imposition of the death penalty. During the trial court's *voir dire* of venireman Patricia Botta, the following colloquy occurred:

"[THE COURT]: Do you have any conscientious, religious, or moral scruples against the imposition of the death penalty?

[VENIREMAN BOTTA]: I really would not be for it, sir.

Q. Are you saying, in effect, then that under no circumstances would you sign your name to a death penalty verdict?

A. I really don't believe I could.

Q. Okay. I would be giving instructions concerning the criteria or standards that a jury is to follow or consider in coming to a conclusion as to whether a case is appropriate for the death penalty or inappropriate for the death penalty. Would you be able to follow those instructions in arriving at a verdict unanimously with eleven other jurors?

A. I don't know really how to answer that, you know, because my feelings are definitely—I don't think I could really live with the situation."

Jerry contends that venireman Botta's responses were ambiguous, and that it was improper for the trial court to excuse her for cause without further inquiry into her feelings regarding the death penalty.

A venireman who expresses only general objections to the death penalty may not be excused for cause. (*Witherspoon v. Illinois* (1968), 391 U.S. 510, 522, 20 L. Ed. 2d 776, 784-85, 88 S. Ct. 1770, 1777.) The venireman's views regarding the death penalty will warrant exclusion for cause only where they will " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt* (1985), 469 U.S. 412, 420, 83 L. Ed. 2d 841, 849, 105 S. Ct. 844, 850, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526.

Venireman Botta's response to the trial court's question is almost identical to the responses discussed in *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 431, and *People v. Gacho* (1988), 122 Ill. 2d 221, 238-40. In *Del Vecchio*, the venireman stated, " 'I don't think I have the right to

[impose the death penalty].' " (*Del Vecchio*, 105 Ill. 2d at 431.) This court held that the words "I think" did not render the venireman's response vague or ambiguous. (*Del Vecchio*, 105 Ill. 2d at 431.) The venireman in *Gacho* responded, " 'No, I would rather not,' " when asked if she could consider imposing the death penalty under any circumstance. (*Gacho*, 122 Ill. 2d at 240.) Again, this court found that the trial court's questions in *Gacho* demonstrated that the venireman's views concerning the death penalty would prevent or substantially impair the performance of her duties as a juror. *Gacho*, 122 Ill. 2d at 240.

In this case venireman Botta was asked questions about her feelings regarding the death penalty. To each of these questions she gave the following responses, respectively: "I really would not be for it"; "I really don't believe I could"; and, "I don't know how to answer that, you know, because my feelings are definitely—I don't think I could really live with the situation." The record demonstrates that the trial court varied the form of the question in an attempt to elicit a different response; however, the venireman remained unwavering in her views. Given the trial court's superior position to determine what venireman Botta intended to convey with her responses, we cannot say on this record that the trial court erred in excusing her.

Jerry contends next that the trial court erred in admitting Richard Pueschel's in-court identification of him as one of the two "men that were in [the Pueschel residence] on August 29, 1983." Jerry asserts that everything he received from the State during discovery indicated that no one would be able to identify him as one of the perpetrators of the crimes. He further asserts that Richard Pueschel admitted that he had a 15- to 20-minute conversation with Assistant State's Attorney Malatesta a month prior to trial, and that Assistant State's Attorney Malatesta admitted that during that interview Richard had told him he was "99 per cent sure" he could

identify Reginald and Jerry as the perpetrators. Jerry concludes that the State was required to disclose Richard's oral statement that he could identify him, and that the trial court erred in failing to either strike the testimony or declare a mistrial.

Supreme Court Rule 412(a)(i) provides in pertinent part:

"412. Disclosure to Accused

(a) *** the State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

(i) the names and last known addresses of persons whom the State intends to call as witnesses, together with their relevant written or recorded statements, memoranda containing substantially verbatim reports of their oral statements, and a list of memoranda reporting or summarizing their oral statements." 107 Ill. 2d R. 412(a)(i).

It is clear that the State is required to disclose a witness' oral statements only if they are in "memoranda containing substantially verbatim reports of their oral statements." Both parties agree that Richard's statement was never memorialized. It would appear from the foregoing that the State was not required to disclose the statement. Nevertheless, Jerry argues that there is an exception to this rule where the State's failure to reduce the statement to "written form amounts to an intentional tactic to prevent disclosure of relevant material to the defendant." (*People v. Szabo* (1983), 94 Ill. 2d 327, 348, citing *People v. DeStefano* (1975), 30 Ill. App. 3d 935, and *People v. Manley* (1974), 19 Ill. App. 3d 365.) A review of the cases to which Jerry cites in support of his assertion demonstrates that they are inapposite.

In *Szabo*, this court vacated defendant's convictions and remanded the case for further proceedings where it was shown that the State had deliberately destroyed "rough notes" made while conducting 20 witness interviews, totalling approximately 30 hours. (*Szabo*, 94 Ill. 2d at 343, 350.) In *DeStefano*, the appellate court reversed defendant's murder conviction where a prosecu-

tor admitted that he had ordered agents of the Illinois Bureau of Investigation to refrain from taking any written statements from defendant's alleged accomplice who had been granted immunity from prosecution. (*DeStefano*, 30 Ill. App. 3d at 943.) Finally, in *Manley* the appellate court upheld a trial court's ruling holding a prosecutor in contempt of court where he admitted that it was the practice of his office to refrain from reducing a witness' oral statements to writing in order to surprise the defendant at trial. *Manley*, 19 Ill. App. 3d at 369, 372.

In contrast to the cases cited above, there is no evidence in this case to demonstrate that the State acted in bad faith. Jerry asserts that bad faith is demonstrated by the State's failure to "correct erroneous information" contained in documents produced during discovery. However, he fails to point to even one document which contained this allegedly "erroneous information." We will not presume lightly bad faith on the part of the State, and the sole fact that Jerry was "surprised" by Richard's in-court identification of him as one of the perpetrators of the crimes cannot be grounds for such a finding.

Jerry next asserts that a statement Jo Ellen Pueschel's mother made from the gallery during the redirect examination of Reginald denied him a fair trial. During defense counsel's redirect examination of Reginald Mahaffey, the following colloquy took place:

"Q. Did you kill the Pueschels?

A. No, sir.

MRS. JOSEPHINE HEINRICH (From the audience): Did you kill my daughter? I'm sorry.

THE COURT: Ma'am please.

MRS. JOSEPHINE HEINRICH (From the audience): —my grandson

THE COURT: Ma'am, please, Mrs. Heinrich. Continue, Mr. Levin.

MR. LEVIN [counsel for defendant Reginald Mahaffey]: I want a recess now, please.

THE COURT: There is no need for it; there is no need for it.

MR. LEVIN: I have a motion then, your Honor.

MR. DECKER [counsel for defendant Jerry Mahaffey]: We also wish to join in on behalf of Jerry Mahaffey.

THE COURT: We will take your motion up after the recess. Continue your questions.

MR. LEVIN: I have no further questions.

MR. MALATESTA: We have no further questions.

MR. DECKER: Judge, if I may briefly."

After Mr. Decker finished cross-examining Reginald, all counsel and the court recessed into chambers where counsel for both defendants made a motion for a mistrial. After hearing argument of counsel, and having the court reporter read back the record of Mrs. Heinrich's statement, the trial court denied the motion, stating:

"I heard the unfortunate occurrence and I was present. As soon as Mrs. Heinrich got up and began to yell, because that is what she did, the statement that the court reporter just read I immediately said, 'Ma'am, stop' or whatever I said. Her husband and two sons immediately jumped up and smothered her in their arms. She broke away from them and said something else, whatever it was I did not catch, but it was some type of remark. She was red in the face and obviously emotional at the time, then they led her away.

Now, it is an unfortunate circumstance in a case that has been relatively free of courtroom hystrionics. However, with all of the admonitions that I have made to the jury in the past and the admonitions that I intend to give to the jury in connection with this particular statement and knowing the quality of the jurors that were selected in this case, I believe that they can truly put aside from their deliberations the emotional statement that was made by Mrs. Heinrich and can consider this case based on the evidence they heard from the witness stand.

I will admonish them now and I will admonish them again at the conclusion with the regular instructions. However, I do not feel that it is of such moment that it would prejudice the defendants to such an extent that it would prevent them from getting a fair and impartial trial.

Your motions for mistrial are denied."

Court then reconvened and the trial court admonished the jurors in the following manner:

"If you remember when we were first selecting you as jurors I asked you questions concerning whether or not you would be able to judge this case based solely and exclusively on the testimony you heard from this witness stand, the arguments of the lawyers and my instructions to you, and you each said that in your own way that you'd be able to do that. And you each were able to say that you would not allow sympathy or prejudice to influence your verdict but would again concentrate your deliberative efforts solely and exclusively on what you heard in this courtroom from that witness stand.

We had an incident today, you were all present here. I would ask you and instruct you now orally and we will further instruct you later on, that you do not in any way consider the incident that took place in any way in coming to your conclusions as to the guilt or innocence of either Reginald Mahaffey or Jerry Mahaffey. As best you possibly can, put that from your mind when you are deliberating on this. You said you'd be able to do that before, I have confidence that you will be able to do it. But I am again stressing that this is one of the things that you said you would be able to do and when you put your hand up and took the oath that is one of the obligations that you imposed upon yourselves, and I am sure you will be able to do that."

We find instructive this court's decision in *People v. Herbert* (1935), 361 Ill. 64. In *Herbert*, the defendant testified at trial, and was asked whether he had murdered the victim. When the defendant denied his involvement in the crime, the victim's widow shouted, "You dirty, lying thing, you! How dare you sit there and say that! You dirty liar!" This court found that the remarks did not deny defendant a fair trial, although it stated that the trial court should have admonished the jury to disregard the remarks. *Herbert*, 361 Ill. at 71-72.

Mrs. Heinrich's remarks in this case can in no way be considered as inflammatory as those at issue in *Herbert*. Mrs. Heinrich's remarks were not accusatory, but merely re-asked the question which Reginald had just answered. Furthermore, the trial court did not highlight the incident by immediately recessing court and allowing the jurors to dwell on the incident, but allowed re–cross-examination to continue. Finally, the trial court followed *Herbert*'s dictates and thoroughly admonished the jurors to ignore the incident and rely solely on the evidence when deliberating.

Jerry asserts the trial court's instruction that the jurors should ignore the remarks "[a]s best you possibly can" is a weak admonition and left the jury with the impression that the instruction was permissive rather than compulsive in nature. This argument substantially ignores the majority of the court's statement, which clearly instructed the jury that it was their duty "to judge this case based solely and exclusively on the testimony [they] heard from [the] witness stand." Based on the record before us, we cannot say Jerry was denied a fair trial.

Our conclusion that the trial court did not err in determining that the jury could properly perform its function at the guilt phase of the trial also compels us to disagree with Jerry's assertion that Mrs. Heinrich's comments entitled him to a new jury at the sentencing phase. Nevertheless, Jerry cites to a recent Supreme Court case which he contends requires us to remand the case for resentencing. (See *Turner v. Murray* (1986), 476 U.S. 28, 90 L. Ed. 2d 27, 106 S. Ct. 1683.) We disagree. In *Turner*, the Supreme Court stated that "[b]ecause of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected." (*Turner*, 476 U.S. at 35, 90 L. Ed. 2d at 35, 106 S. Ct. at 1687.) The Court went on to hold "that a capital defendant accused of an interracial crime is entitled to

have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." (476 U.S. at 36-37, 90 L. Ed. 2d at 37, 106 S. Ct. at 1688.) *Turner* involved the role that racial bias may have in influencing a sentencing jury. Jerry asks this court to extend the holding in *Turner*, and find that Mrs. Heinrich's comments may have influenced this jury in the same way that undetected racial bias may have influenced the sentencing jury in *Turner*. We see no reason to give *Turner* such an expansive reading. Having thoroughly reviewed the record concerning Mrs. Heinrich's comments and the trial court's admonitions to the jury to disregard those comments in their deliberations, we find Jerry's contention to be without merit.

Jerry's next argument revolves around the State's failure to have Cedric Mahaffey fingerprinted or to testify at trial. Jerry asserts that some of the prosecution's statements during trial and closing argument shifted the burden of proof to him to produce Cedric Mahaffey at trial, and undermined the presumption of his innocence. When the disputed comments are placed in context, however, it becomes apparent that any error was invited.

During its closing argument, the State *never* made reference to the failure of Jerry to call Cedric Mahaffey to testify. However, in his closing argument Jerry's counsel made several references to the fact that the State had failed to call Cedric Mahaffey as a witness:

> "For you see, the burden in this instance is upon these two prosecutors. That is their job. If you feel that they have failed to present a critical witness to you, who you would have wanted to hear and see, that would have helped you establish in your own minds, was there a reasonable doubt in this case or was there not? Then you see, that is their burden. That is their job, the job that they are paid to do, and the job that they accepted to do when they accepted their office. If you feel that they failed in that burden, well then by your oath, your own job, your decision must be that of not guilty.

\* \* \*

\*\*\* [U]nless you were convinced beyond a reasonable doubt, unless you were convinced that the State has met their burden in this case \*\*\* [t]hat they would call those witnesses who had information about this case, that they would call that felon, Cedric Mahaffey."

It was only after Jerry's counsel raised the issue of Cedric Mahaffey's failure to testify that the prosecutor made the following comments during rebuttal closing arguments which Jerry now cites as error on appeal:

"There is no greater power in this nation concerning a case. before a court and that man that is sitting right up there. If I walked up to this man and I said, Your Honor, I want to subpoena this witness, and if they walked up to this man and they said, Your Honor, we want to subpoena this witness; it could be President Reagan himself, the President of the United States; and do you know what, ladies and gentlemen? He must appear. He must appear.

Do not—do not believe, for one minute, that if they wanted to, they could not have brought Cedric Mahaffey into this courtroom. They did not want to.

MR. DECKER [counsel for defendant Jerry Mahaffey]: Objection.

MR. MALATESTA: And do you know why?

THE COURT: Overruled.

MR. LEVIN [counsel for defendant Reginald Mahaffey]: Objection.

[MR. MALATESTA]: And if they wanted to bring in Cedric Mahaffey to contradict Sergeant Byrne, they could have done it in a second. They know exactly where he is.

MR. DECKER: Objection, your Honor.

MR. MALATESTA: They know exactly where he is.

MR. LEVIN: Objection.

THE COURT: Overruled. Overruled.

\* \* \*

[MR. MALATESTA]: They are looking for one of you to be silly enough to believe his story, to be silly enough to not listen to what you heard on that stand, and believe his story about this mystery man that we didn't listen to for two weeks.

> There's no mystery. You know exactly where he's at. They know exactly where he's at. They know exactly where he's at.
>
> MR. DECKER: Objection once again, your Honor.
>
> THE COURT: Overruled."

From the foregoing, it is apparent that at the very least, defense counsel was arguing that Cedric Mahaffey was privy to some exculpatory information. Pursuing this line of argument, defense counsel demanded that the State explain Cedric's failure to testify. In response to this challenge, the State reminded the jurors of the power of compulsory process, and argued that Jerry's innocence was not the only inference to be drawn from Cedric's failure to testify. Because the comments were invited, they cannot be relied upon as error on appeal. *People v. Collins* (1985), 106 Ill. 2d 237, 284.

Jerry also asserts as error the prosecutor's statement regarding the fact that Jerry also had the ability to procure Cedric Mahaffey's prints. During defense counsel's cross-examination of the State's fingerprint expert, the expert was asked whether the State's Attorney's office could obtain Cedric Mahaffey's palm print. The State objected to the question, and stated that the defense also had the ability to obtain Cedric Mahaffey's finger and palm prints. Jerry contends that the comment had the effect of shifting the burden of proof to him to prove his innocence.

The record reveals that the trial court, at defense counsel's request, instructed the jury to disregard the comment. Moreover, the prosecutor did not dwell on the matter, and the record demonstrates the jury was properly instructed throughout the trial regarding the presumption of innocence and the State's burden of proof. On these facts, we cannot say that this isolated remark, nor any of the remarks Jerry cites as error, was a material factor in his convictions such that the outcome of the verdict would have been different. *Collins*, 106 Ill. 2d at 276.

Jerry's next contention is that the State failed to prove the *corpus delicti* of the rape. We disagree. This court has held that:·

"[I]n establishing the *corpus delicti*, there must be some evidence, apart from the confession, demonstrating that a crime occurred. ***

\* \* \*

*** [I]f the independent evidence *tends* to prove that an offense occurred, then such evidence, if corroborative of the facts contained in the confession, may be considered along with the confession in establishing the *corpus delicti*. In such event, the independent evidence need not establish beyond a reasonable doubt that an offense did occur." (Emphasis in original.) (*People v. Willingham* (1982), 89 Ill. 2d 352, 360-61.)

In this case, the evidence shows that Jo Ellen Pueschel was found dead, lying face down on the kitchen floor, clad only in a nightgown with no undergarments. Expert testimony also showed that her vagina was "widely patent" and that the vaginal swab taken from her tested positive for the presence of sperm. In his confession, Reginald stated that he led Mrs. Pueschel out of the bedroom in which he found her, and had vaginal intercourse with her in the living room and the kitchen. Jerry stated in his confession that Mrs. Pueschel was wearing a blue negligee. It is clear that the condition of Mrs. Pueschel's body when found and the physical evidence suggesting recent intercourse tend to prove that an offense occurred. Furthermore, these facts, when coupled with both of the defendants' statements, establish the *corpus delicti* of rape.

Jerry cites to several cases in support of his argument that the State failed to prove the *corpus delicti* of the rape: *People v. Lambert* (1984), 104 Ill. 2d 375; *People v. Thomas* (1960), 18 Ill. 2d 439; *People v. Kokoraleis* (1986), 149 Ill. App. 3d 1000; *People v. Anderson* (1974), 20 Ill. App. 3d 840. All are inapposite. Two of the cases to which Jerry cites deal not with· proving the *corpus delicti* of rape, but with evidence corroborating a rape

complainant's testimony. (*Thomas*, 18 Ill. 2d at 444; *Anderson*, 20 Ill. App. 3d at 849.) In *Kokoraleis* there was no evidence to corroborate defendant's confession to the crime of rape because the victim's body and clothing were badly decomposed. (*Kokoraleis*, 149 Ill. App. 3d at 1027-28.) In contrast to the lack of physical evidence in *Kokoraleis*, the evidence in this case demonstrates that the victim was found lying face down in the kitchen clad only in a nightgown, and that her vagina was widely patent. Moreover, the vaginal swab taken from her tested positive for the presence of sperm. Finally, the only evidence in *Lambert* outside of the defendant's confession tending to show that defendant had committed the crime of indecent liberties with a child was that the defendant slept in the basement while living with the victim's family, and that the victim's rectum was "pinkish and swollen" two to three weeks after he had slept in the basement defendant used as a bedroom. (*Lambert*, 104 Ill. 2d at 379-80.) In contrast to the break in the evidentiary chain occasioned by the two to three week delay in *Lambert*, the evidence of rape in this case was discovered within a few hours after the crime occurred. We therefore conclude that the State has established the *corpus delicti* of the rape.

In a related contention, Jerry asserts that the case must be remanded for resentencing. He contends that because the State failed to prove the *corpus delicti* of the rape, a factor in aggravation has been shown not to exist. Given our conclusion that the State did prove the *corpus delicti* of the rape, this contention must be deemed to be without merit.

Jerry next contends that the prosecutor's statements during rebuttal argument at the death phase denied him a fair sentencing hearing. The record reveals however that the statements were merely a proper response to statements defense counsel made in closing argument.

During closing argument at the death phase, Jerry's counsel told the jury to not allow the prosecutors to

force them to "become an instrument of violence," and argued that there was "no easy way to determine how to kill someone and when we [should kill someone.]" Counsel added, "I am certainly glad of one thing[,] I am glad that is your job and not mine." Counsel continued this line of argument, stating that additional violence in the form of a death sentence for Jerry would not bring the victims back to life, and that they should not err "on the side of violence," but "on the side of mercy."

In response to these remarks, the State argued:

"You are not the instrument of violence, you are a group of people from all sections of our community. You are a group of people who came together a little less than a month ago and had the opportunity to participate first-hand in what I believe to be the most important part of our lives. And that is the insurance that justice; not a word[,] a reality, that justice is part of our criminal justice system, that it is real.

In your actions, in what we are asking you to do, and that is to follow the law, in your following of that law, in that law that must be meaningful, you are not killing anyone, you are not creating a violent society, you are carrying out the law and making it meaningful. You are telling the real people that are violent in our society that we cannot tolerate it any longer, we will not tolerate it any longer.

All of this time, all of the sacrifice that each and every one of you has given to us cannot stop now, it can't. In order for that law to be meaningful you must have the courage to carry it out and courage it takes. There is no mistake about what it takes to insure that there is order in our society.

\* \* \*

You, by your decision in following the law, are not putting anyone to death. You are carrying out the will of the people and you are following the law that is necessary for our time. We have tried what Mr. Decker asked of you, to get to the cause. We have tried to rehabilitate, we have tried it in this case on these two men and it just doesn't work. Not only did it not work for them but it

shows and creates and allows a total disregard and disrespect for the laws that govern us.

\* \* \*

Do not feel guilty for being courageous enough to participate in the criminal justice system. Do not feel guilty that collectively you have come together to insure justice.

You as an individual (indicating), and you as an individual (indicating), are not killing Jerry and Reginald Mahaffey as they suggested. You, as a jury, as a representation of our community, are carrying out the law."

It is clear that when the prosecutor's comments are read in context, he was merely denying that the jurors were instruments of violence, and focusing on their duty to follow and enforce the law. The prosecutor's comments did not seek "to minimize the jury's sense of responsibility for determining the appropriateness of death." (*Caldwell v. Mississippi* (1985), 472 U.S. 320, 341, 86 L. Ed. 2d 231, 247, 105 S. Ct. 2633, 2646.) Quite the contrary, a complete review of the record indicates that the arguments of both parties insured that the "jury recognize[d] the gravity of its task and proceed[ed] with the appropriate awareness of its 'truly awesome responsibility.' " *Caldwell*, 472 U.S. at 341, 86 L. Ed. 2d at 247, 105 S. Ct. at 2646.

Jerry also contends that the prosecutor erred in stating that "[w]hen they tell you that they will spend the rest of their lives in prison, there's no guarantee." The evidence introduced at the sentencing hearing showed that Jerry escaped from Cook County jail while awaiting trial. When asked at the sentencing hearing whether he would attempt to escape again, he replied, "I don't know." From the foregoing it can be seen that the prosecutor's comments were not improper, as they were clearly based on evidence adduced at the sentencing hearing. See *People v. Johnson* (1986), 114 Ill. 2d 170, 198.

Jerry also asserts that the prosecutor erroneously "belittled" a recognized factor in mitigation, namely, that he "grew up in a bad area." The record reveals that defendant failed to object to this statement, and failed to

include the purported error in his post-trial motion. The issue is therefore waived through procedural default. *People v. Gacho* (1988), 122 Ill. 2d 221, 239; *People v. Holman* (1984), 103 Ill. 2d 133, 181-82 (Ryan, C.J., concurring in part and dissenting in part).

Jerry also contends that the prosecutor's statement that a sentence of life imprisonment would have the effect of "letting [the defendants] go," "created the unacceptable risk that the death penalty was imposed on the basis of some extraneous fear of rewarding the defendants." The record reveals however that the prosecutor was merely arguing that death was a reasonable form of punishment in this case. See *People v. Albanese* (1984), 102 Ill. 2d 54, 81.

Jerry next asserts that the trial court erred in refusing to instruct the jury that if it failed to sentence him to death, the court would sentence him to a term of natural life imprisonment. This court has recently held that:

> "An instruction in the case of multiple murders should state that if the jury finds mitigating factors sufficient to preclude imposition of the death penalty, the defendant will be sentenced to natural life imprisonment, and no person serving a term of natural life imprisonment can be paroled or released, except through executive clemency." (*People v. Gacho* (1988), 122 Ill. 2d 221, 262.)

The new rule announced in *Gacho* was held to be prospective only (*Gacho*, 122 Ill. 2d at 263); therefore, the trial court properly instructed the jury in accordance with existing law (see *People v. Albanese* (1984), 102 Ill. 2d 54, 81; *People v. Stewart* (1984), 105 Ill. 2d 22, 71). Jerry argues that the Supreme Court's recent decision in *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708, which held that decisions announcing new constitutional rules of criminal procedure are "to be applied retroactively to all cases, state or federal, pending on direct review or not yet final," requires us to reexamine our holding in *Gacho*. This issue was recently decided adversely to Jerry in *People v. Harris* (1988),

123 Ill. 2d 113, where we declined to reconsider our holding regarding the retroactivity of new rules announced before the Supreme Court's decision in *Griffith*. *Harris*, 123 Ill. 2d at 130.

Jerry next contends that the trial court erred in holding a joint death penalty hearing. Without citation to any part of the record or any supporting authority, Jerry asserts "that jurors find it impossible to rationally differentiate imposing the death sentence on one defendant while sparing the second defendant and, so will inflict it on both of them."

Jerry failed to include this issue in his post-trial motion, thereby waiving the issue through procedural default. (*People v. Gacho* (1988), 122 Ill. 2d 221, 239; *People v. Holman* (1984), 103 Ill. 2d 133, 181-82 (Ryan, C.J., concurring in part and dissenting in part).) Moreover, his failure to cite to any authority or to any section of the record in support of his argument also results in waiver of the issue pursuant to Supreme Court Rule 341 (107 Ill. 2d R. 341). Given these deficiencies, we must deem the issue to be without merit.

Jerry's next contention is that his death sentence is excessive given his light criminal background and "deep family support." We begin by noting that when reviewing a sentence of death, this court will make a separate review of the record but will not overturn a trial court's finding when that finding is amply supported by the evidence. *People v. Brownell* (1980), 79 Ill. 2d 508, 539-40.

The evidence adduced at the sentencing hearing reveals that Jerry has a record of criminal conduct dating back to 1979. He has three convictions for robbery, two for retail theft and one for theft. We find significant the fact that his criminal conduct continued even after his arrest for these crimes, as evidenced by the fact that he robbed a prison guard and escaped from prison while awaiting trial. When Jerry's criminal background, and his conduct while in prison, is coupled with the crimes of which he has presently been convicted, we find no rea-

son to overturn the jury's finding that there are no mitigating factors present to preclude imposition of the death penalty.

Jerry next raises several claims challenging the constitutionality of the Illinois death penalty statute, all of which have been resolved against him. The statutory grant of discretion to the prosecutor of whether to seek the death penalty in a particular case is valid and constitutional. (*People v. Evans* (1988), 125 Ill. 2d 50, 98; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 534-43.) The State does not have to prove the absence of mitigating factors beyond a reasonable doubt. (*People v. Johnson* (1987), 119 Ill. 2d 119, 151; *People v. Kubat* (1983), 94 Ill. 2d 437, 504.) The death penalty statute does not place an impermissible burden of proof upon the defendant to establish mitigating factors. (*People v. Orange* (1988), 121 Ill. 2d 364, 390.) Moreover, the death penalty statute does not deprive the defendant of adequate appellate review. (*People v. King* (1986), 109 Ill. 2d 514, 551; *People v. Gaines* (1981), 88 Ill. 2d 342, 383-84.) We have also determined that sympathy should not be considered as a mitigating factor (*People v. Crews* (1988), 122 Ill. 2d 266, 291-93), and we have found no merit to the statistical argument that killers of whites are more likely to receive the death sentence than are killers of blacks (*People v. Davis* (1987), 119 Ill. 2d 61, 64-66; *People v. Spreitzer* (1988), 123 Ill. 2d 1, 45-46).

For the reasons set forth above, we reverse defendant Reginald Mahaffey's convictions and remand the case for a new trial. We affirm defendant Jerry Mahaffey's convictions and his sentence of death. We hereby direct the clerk to enter an order fixing the date of Tuesday, September 12, 1989, as the date on which the sentence of death entered by the circuit court of Cook County shall be carried out. Defendant Jerry Mahaffey shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). A

certified copy of this mandate shall be transmitted by the clerk of this court to the Director of Corrections, the warden of Stateville Correctional Center, and to the warden of the institution where defendant Jerry Mahaffey is confined.

*No. 61821 — Affirmed.*
*No. 61822 — Reversed and remanded.*

JUSTICE MILLER, concurring in part and dissenting in part:

I join that part of the court's opinion with respect to cause No. 61821, which affirms the convictions and death sentence of defendant Jerry Mahaffey. I do not agree with the court, however, that a new trial is required in cause No. 61822, involving defendant Reginald Mahaffey, and therefore I dissent from that portion of the majority opinion.

The defendants were tried jointly before a jury on charges stemming from the murder of Dean and Jo Ellen Pueschel, the sexual assault of Mrs. Pueschel, and the attempted murder of the Pueschels' 11-year-old son, Richard. At trial the State presented the identification testimony of Richard Pueschel as well as evidence establishing that certain items of property belonging to the Pueschels were discovered in the defendants' possession when they were arrested in connection with the offenses here. The State also presented, as part of its case in chief against each defendant, that defendant's confession to the crimes; the jurors were instructed, both when the confessions were published and later, at the outset of deliberations, not to rely on the confession of one defendant in determining the guilt or innocence of the other. At trial the defendants challenged the accuracy of their confessions. Reginald Mahaffey testified, and he denied any involvement in the offenses and claimed that his confession was the product of coercion. Jerry Mahaffey, who did not testify, presented a similar defense through the testimony of other witnesses, disputing the strength

of the State's evidence and attempting to show that his own confession was also coerced.

Before trial the defendants had moved for a severance on the grounds that the State's intended use of the confessions would, under *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, deny them their right to confront witnesses. The trial judge denied the motion, relying on the plurality opinion in *Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132, which held that *Bruton* error does not occur if a defendant's own confession, introduced into evidence, "interlocks" with, or is corroborated by, the confession of the nontestifying codefendant and the jury receives instructions correctly limiting the use of the evidence.

The Supreme Court has since rejected *Parker*, however, in *Cruz v. New York* (1987), 481 U.S. 186, 95 L. Ed. 2d 162, 107 S. Ct. 1714. Because Jerry Mahaffey did not testify at trial, codefendant Reginald Mahaffey claims that, under *Bruton* and *Cruz*, he was denied his confrontation right by the introduction of Jerry's incriminating confession. The State now contends that there were sufficient indicia of reliability to have warranted substantive evidentiary use of Jerry Mahaffey's confession against Reginald Mahaffey and, alternatively, that the *Bruton* error was harmless. For the reasons set out below, I would conclude that what error occurred was indeed harmless and does not necessitate a new trial.

*Bruton* errors, though constitutional in nature, do not mechanically compel reversal (see *Cruz*, 481 U.S. at 193-94, 95 L. Ed. 2d at 172, 107 S. Ct. at 1719), and a conviction may be upheld if the reviewing court is able to determine that the constitutional violation was harmless beyond a reasonable doubt (see *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824). This requires consideration of the strength of the competent evidence of the defendant's guilt and the probable effect on the jury of the nontestifying codefendant's con-

fession. See *Brown v. United States* (1973), 411 U.S. 223, 36 L. Ed. 2d 208, 93 S. Ct. 1565; *Schneble v. Florida* (1972), 405 U.S. 427, 31 L. Ed. 2d 340, 92 S. Ct. 1056; *Harrington v. California* (1969), 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726.

The State presented substantial evidence establishing Reginald Mahaffey's guilt of the offenses charged here. At trial Richard Pueschel, who survived the brutal attack, identified the defendants as the family's assailants. The State also presented Reginald Mahaffey's confession to the crimes. In his statement, Reginald Mahaffey described the brothers' entry into the Pueschels' apartment, the attempt to strangle the Pueschels' son, Richard, the murder of Mr. Pueschel, the sexual assault and murder of Mrs. Pueschel, the removal of a number of possessions from the apartment, and the brothers' escape in the victims' car. Reginald Mahaffey's account of the offenses was confirmed by investigating officers, whose analysis of the crime scene verified the details given in the confession.

Numerous items identified at trial as belonging to the victims were found in Reginald Mahaffey's possession at the time of his arrest, four days after the offenses occurred. In Reginald Mahaffey's room police officers discovered Mr. Pueschel's .357 Magnum revolver and Remington shotgun; the handgun bore traces of blood consistent with Mrs. Pueschel's blood type. The officers also found a stereo dust cover containing 24 pieces of jewelry belonging to the Pueschels, including several bracelets bearing the victims' names. Reginald Mahaffey was wearing Mr. Pueschel's ring, and he had in his pocket Mr. Pueschel's watch and crucifix. At trial Reginald testified that he had purchased the guns and other items from another man; there was no evidence to corroborate that explanation. Police officers found the Pueschels' television set, video cassette recorder, and videotapes in Jerry Mahaffey's own apartment.

In view of the substantial evidence of Reginald Mahaffey's guilt, I do not believe that it can be said that he was prejudiced by the State's use at the joint trial of his brother's confession, which, like his own, implicated both defendants. In this regard, it may be noted that the Mahaffeys' defenses to the charges were complementary rather than antagonistic. Their shared theory of defense claimed that they did not take part in the attack on the Pueschels and that their confessions to those crimes were involuntary. If Jerry Mahaffey had taken the witness stand at trial, he would have denied involvement in the offenses and would have asserted that his inculpatory statements to the police were coerced. But other testimony on those claims was introduced into evidence on Jerry Mahaffey's behalf. In essence, Jerry's failure to testify cost Reginald Mahaffey only the opportunity to present further testimony in support of the defense contentions.

Assuming that a *Bruton* error occurred in this case, I would hold that the violation was harmless beyond a reasonable doubt, and I would therefore consider in the present appeal the remaining arguments raised by defendant Reginald Mahaffey in cause No. 61822.

JUSTICE RYAN joins in this partial concurrence and partial dissent.