2024 IL App (1st) 230944-U

FIRST DISTRICT,
SIXTH DIVISION
September 30, 2024

No. 1-23-0944

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 18 CR 0509501 |
| | ) | |
| TIMOTHY P. MCGUIRE, | ) | Honorable |
| | ) | Steven J. Rosenblum, |
| Defendant-Appellant, | ) | Judge Presiding. |

_____

JUSTICE GAMRATH delivered the judgment of the court.
Justices Hyman and C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in denying defendant's motion to quash arrest and suppress evidence, denying defendant's motion for discovery violation sanctions, or sustaining objections to inadmissible evidence, and the record reflects the trial judge was impartial throughout the proceedings.

¶ 2    The defendant, Timothy P. McGuire, was involved in an automobile accident that caused the death of Armida Reyes, a passenger in the other car involved in the accident. McGuire was taken to the hospital and medical personnel drew his blood twice: once while administering medical treatment and once at the direction of police officers. Following a jury trial, McGuire was convicted of aggravated driving under the influence (aggravated DUI) (625 ILCS 5/11-501(a)(1),

(2)) (West 2018), and sentenced to a term of 90 months' imprisonment. McGuire appeals. We affirm.

¶ 3                                                I. BACKGROUND

¶ 4        On the night of March 11, 2018, the defendant, Timothy McGuire, was driving a vehicle that collided with the car driven by Phillip Reyes at an intersection in Tinley Park, Illinois. Phillip's mother Armida Reyes was seated in the front passenger seat and pronounced dead at the scene. McGuire was taken via ambulance to St. James Hospital where blood was drawn at approximately 11:15 p.m. while he was receiving medical treatment ("medical blood draw") and again at approximately 1:10 a.m. on March 12, 2018, at the request of law enforcement for a DUI kit ("police blood draw"). McGuire was subsequently charged with numerous offenses, including aggravated DUI while McGuire's alcohol concentration was .08 or more (625 ILCS 5/11-501(a)(1) (West 2018)) and aggravated DUI while under the influence of alcohol (625 ILCS 5/11-501(a)(2) (West 2018)).

¶ 5                        A. Motion to Quash Arrest and Suppress Evidence

¶ 6        Prior to trial, McGuire filed a motion to quash arrest and suppress evidence, seeking to bar admission of the evidence of the medical and police blood draws. McGuire argued police officers lacked probable cause to arrest him, he did not consent to a blood draw, the police did not have a warrant for the police blood draw, he did not have injuries that required hospitalization, and the medical blood draw was an "extension and product of [his] illegal arrest."

¶ 7        At the suppression hearing, Tinley Park Police Sergeant Randall Rockaitis testified that on March 11, 2018, at about 10:00 p.m., he was called to 167th Street and 80th Avenue and saw two vehicles in the intersection. McGuire was the driver and sole occupant of one car and Phillip was the driver of the other car. Armida was pronounced dead at the scene and the rear seat passenger, Christine Marquez, was transported to Christ Hospital for treatment.

¶ 8        Rockaitis approached McGuire and asked him questions, but McGuire had "a hard time answering them due to his condition." McGuire gave "one- or two-word answers, short answers" and "incorrect answers." After being asked "several times," McGuire acknowledged he was coming from a liquor store in Chicago but gave the wrong direction of travel. Eventually, Rockaitis stopped questioning McGuire because he was not "getting enough answers that were beneficial to any type of investigation." McGuire said he hit his head, and he needed some type of medical attention because of cuts to his hand.

¶ 9        Because of his head injury and inability to completely answer questions, the paramedics made the decision to transport McGuire to the hospital for medical treatment. Rockaitis testified that McGuire "couldn't stand," so he and Police Officer Sonny London lifted McGuire onto a cot into the ambulance. Rockaitis did not administer field sobriety tests or a portable breath test because he believed that medical treatment was "the best option." Rockaitis followed the ambulance to the hospital in his squad car with his emergency lights activated. Based on "the incident at the scene, *** continual smell of an odor of alcoholic beverages from [McGuire's] breath and his behavior at the hospital," Rockaitis read McGuire the "Warning to Motorist" and informed him that he was under arrest at approximately 10:55 p.m.

¶ 10        At this point, Rockaitis "advised" McGuire that he "needed to get blood and urine from him" and McGuire responded, "Yeah." Rockaitis requested that hospital staff administer a "DUI kit," which included collecting blood and urine samples. Hospital staff informed Rockaitis that McGuire would have to be "cleared by the doctor" before they could administer the kit. The police blood draw took place at approximately 1:10 a.m., approximately two hours after the medical blood draw was completed by hospital staff during medical treatment. McGuire was discharged from the hospital at approximately 4:00 a.m. and taken to the police station.

¶ 11        Kayla Paxson, a paramedic with Kurtz Ambulance, testified at the suppression hearing that

she arrived at the scene of the accident at approximately 9:55 p.m. McGuire was sitting on the ground near the intersection speaking to officers. Paxson asked McGuire questions to "determine [his] level of consciousness." While McGuire said he was "fine," Paxson observed that he was confused, did not know what happened, and was not "fully alert and oriented." Paxson left McGuire with her partner to treat other individuals. When she returned, McGuire was still sitting on the ground talking to police officers.

¶ 12     Paxson tried to "reason with him to get into the ambulance" but McGuire did not cooperate and was not able to step up into the back of the ambulance by himself. Police officers assisted by putting McGuire onto a cot, and Paxson's partner loaded McGuire into the back of the ambulance. Paxson testified that police officers did not direct the paramedics to put McGuire into the ambulance or transport him to the hospital. She explained that there was a standing order to paramedics that "if somebody appears confused or can't answer all of our questions appropriately, they cannot refuse medical care." Rockaitis confirmed this, saying the ultimate decision to transport McGuire to the hospital rested with the paramedics.

¶ 13     Based on McGuire's injury, confused state, and belligerence, Paxson determined that McGuire was not in the condition to decline medical treatment. The paramedics tried to treat McGuire in the ambulance, but he was "combative" and "physically fought" them during the ambulance ride. Paxson checked a drop-down box in her report indicating that the hospital transport was requested by law enforcement. She testified she had to check the box to "validate" the report and there was no option to indicate that paramedics requested the transport. Paxson testified unequivocally that the paramedics took McGuire to the hospital on their own accord, as part of their standing order, and not at the direction of the police.

¶ 14     Dr. Samantha Margaritis, who treated McGuire at the hospital on March 11, 2018, also testified at the suppression hearing. Dr. Margaritis reviewed a report from the paramedics that

identified McGuire as a driver involved in a motor vehicle collision resulting in a fatality and noted that he was "uncooperative with police and EMS at the scene," "combative," "refused to answer questions," and had "[a]n odor of alcohol on his breath." During the medical examination, McGuire was unable to "provide a history" or relate "exactly what was injured or what hurt him." Dr. Margaritis opined that McGuire was "altered" and was not acting at "his baseline to function in the world." She "reached a clinical impression of alcohol use." Dr. Margaritis ordered the medical blood draw at approximately 11:05 p.m. Blood tests were "always order[ed]" when a patient was involved in a motor vehicle accident to rule out intoxication and look for "another etiology" to explain the patient's "altered" condition. McGuire's blood was drawn at approximately 11:15 p.m. Analysis revealed an "elevated" blood serum alcohol level of 336.4 milligrams per deciliter. Blood and urine were collected for a DUI kit at approximately 1:10 a.m.

¶ 15　　The State did not call any witnesses after McGuire rested on his motion to quash and suppress evidence. The prosecutor stated, "we think that the motion fails on the evidence that's been presented. We are not offering additional evidence."

¶ 16　　The trial court denied McGuire's motion to quash and suppress, finding that the police officers had probable cause to arrest McGuire based on the "serious accident" and evidence McGuire "smelled of alcohol, said he came from a liquor store, couldn't stand up, *** said he didn't even know what happened at the scene," exhibited "extremely slow" responses, and was "in an altered mental state." The trial court also determined that McGuire was not arrested until he was at the hospital. When police officers put McGuire on the cot, they were assisting the paramedics who were a "private organization." The court further found that the medical blood draw was admissible because it was the act of a private actor, not a government action, during the regular course of treatment. The court also found McGuire consented to the police blood draw and "[t]he statute" authorized the draw because of the fatal accident.

¶ 17                                   B. Pretrial Disclosure

¶ 18         McGuire's trial was scheduled to begin on Monday, January 30, 2023. On Friday, January 27th, at around 3:57 p.m., the State tendered to defense counsel a disclosure summarizing an interview with Phillip Reyes that they conducted an hour and a half earlier, at 2:30 p.m., during witness prep. The disclosure stated:

> "Mr. Reyes stated that he stopped at the intersection at 80th Avenue and 167th Street before the accident. Mr. Reyes stated that when he stopped at the stop line, the light for southbound 80th Avenue was red. Mr. Reyes stated he waited until the light turned green with a green left turn arrow before proceeding into the intersection. Mr. Reyes stated that he saw the defendant's car travelling northbound in the curb lane of 80th Avenue before impact."

¶ 19         On Monday, January 30th, McGuire filed a motion to "bar Phillip Reyes' statement," grant a continuance, or provide the defense an opportunity to *voir dire* Phillip concerning his statement made during witness prep. McGuire argued that Reyes's prior statements to police had been "relied on by both the Tinley Park Police accident reconstruction experts as well as [McGuire]'s accident reconstruction and traffic light sequencing experts in forming opinions and as documented in their respective reports." According to McGuire, he "would be prejudiced" because he anticipated calling expert witnesses who would testify "based upon the statements made by Phillip Reyes to the Tinley Park Police Department" and their "accident light reconstruction and traffic light sequencing analysis," that Phillip "failed to yield to Mr. McGuire when making a left-hand turn in front of him which resulted in the accident, Mr. McGuire having the right of way."

¶ 20         In response, the State argued they met their discovery obligation by immediately tendering the statement to defense counsel. The State argued the statement did not prejudice McGuire because Tinley Park Police officers independently determined that Phillip had stopped at the red

light after their completing their investigation, and McGuire was aware of this conclusion. The State asserted there was "no basis" for the court to bar Phillip's testimony and that pretrial *voir dire* would be equivalent to a "mandatory discovery deposition." The proper remedy was to allow defense counsel to cross-examine Phillip on any inconsistencies in his prior statements.

¶ 21    The trial court agreed with the State and held the State was "following their ethical duty" by tendering Phillip's statement when they received it during witness prep. The court ruled that defense counsel would have the opportunity to cross-examine Phillip "on all the statements that he's given through the years." The court pointed out that witnesses change their statements "all the time," but this did not change "anything in the case, nor does it give any reliability to that statement." Observing that the case was five years old, the court did not "see any grounds for a continuance" where McGuire's motion did not indicate that the opinion of the expert witnesses would change based on the new statement. Accordingly, the court denied McGuire's motion to bar Phillip's statement or grant a continuance.

¶ 22                                    C. Trial

¶ 23    At trial, Phillip testified that he was driving south on 80th Avenue on March 11, 2018, at approximately 9:50 p.m. 80th Avenue had two southbound lanes and two northbound lanes with a separate left hand turn lane at the intersection with 167th Street. When Phillip approached the intersection, he slowed down, went into the left turn lane, and stopped at the red light. When the left turn arrow turned green, Phillip drove into the intersection and began turning left. When he was in the middle of the turn, Phillip saw a car driving towards him from the opposite direction in the lane furthest east on 80th Avenue. Armida yelled, "Speed up, speed up" and Phillip attempted to accelerate. The other car made impact with the passenger side of his vehicle near the front seat and Phillip's car came to a stop in the northbound lanes.

¶ 24    After the crash, Phillip found Armida unresponsive in her seat without a pulse. He got out

of his car as McGuire exited the other car and stood near the driver's door. Phillip asked McGuire, "I had the green light and the green arrow. What happened here?" and McGuire responded, "I know. I'm sorry" and walked away. An autopsy later determined that Armida died from multiple injuries due to a motor vehicle collision and the manner of death was an accident.

¶ 25    During cross-examination, Phillip said he spoke to Assistant State's Attorneys ("ASAs") numerous times after the accident, including sometime in "September or October" 2022. Phillip stated that in the interview, the prosecutor was "taking some notes" but Phillip could not see what he was writing. During a sidebar conversation outside the presence of the jury, the State indicated that during the 2022 conversation, the prosecutor did not take notes and there was a second prosecutor present as a "prover." The State further noted that Phillip's answers during the 2022 conversation were consistent with his previous statements "that he didn't remember the color of the lights, that he remembered slowing down, and that he remembered the green arrow." The trial court disagreed with McGuire that "the State has to tender every statement given by an individual when that statement was not memorialized." Instead, the court stated, "You don't tender your prep sessions if you have not taken notes or if there is not an inconsistent statement." Accordingly, the court found that "there is no discovery violation at this time."

¶ 26    Tinley Park Police Officers Graves and London testified that during their interactions with McGuire, they noticed his "mumbled" and "slurred" speech, his inability to answer questions, and the odor of alcoholic beverage on his breath. McGuire indicated that he had injured his left hand and "hit his head on the windshield." London "[i]mmediately had him assessed by the ambulance crew" for a possible head injury. The State published video and audio footage from London's squad car from his interaction with McGuire, though McGuire did not appear on video.

¶ 27    Rockaitis and Paxson testified consistently with their testimony at the hearing on McGuire's motion to quash arrest and suppress evidence. They reiterated their observations of

McGuire that led them to conclude he was under the influence of alcohol. Paxson and Rockaitis explained that it was the paramedics, not the police officers, who made the decision to transport McGuire to the hospital for medical treatment. Because of his apparent impaired state, McGuire was unable to refuse care or transport to the hospital.

¶ 28 Gina Havlik, an expert in the field of toxicology, analyzed McGuire's blood sample from the police blood draw for the presence of ethanol and determined that McGuire's blood alcohol concentration at 1:10 a.m. on March 12 was .223 grams per deciliter. Havlik explained that alcohol concentration dissipates over time as alcohol is eliminated from the person's system.

¶ 29 Tinley Park Police Officer Laura Sanchez, an expert in the field of traffic crash reconstruction, spoke with other officers at the scene of the collision, checked for "Bosch crash data" from the vehicles, and went to Christ Hospital to speak with Phillip. Phillip told her that he did not remember whether he stopped at a red light but "only remembers slowing down to make the left-hand turn." Later, Sanchez utilized crash data and other data from the scene to determine that McGuire's vehicle was traveling at a speed of 32 to 34 miles per hour at the time of the collision while Phillip's vehicle was traveling at a speed of 12 to 14 miles per hour.

¶ 30 In 2020, the defense hired two witnesses to review the evidence, and each prepared reports about their own opinions as to how the collision occurred. In response, Sanchez conducted further investigation and reviewed surveillance video footage from a nearby Midwest Bank at the intersection of 80th Avenue and 167th Street. Sanchez explained that while the video did not depict the collision, it showed Phillip's vehicle stopped in the left turn lane. Based on her analysis of the video, Sanchez came to the opinion that Phillip's car was stopped for 3.28 seconds, until the left arrow turned green, and that he was permitted to make a left turn "without yielding to any traffic." The State rested following Sanchez's testimony.

¶ 31 The defense called Richard Cannon to testify as an expert in the field of traffic and

transportation engineering. McGuire hired Cannon in 2020 to analyze the traffic signal at 80th and 167th and determine "how the signal operated and whether certain sequences were possible." Based on his analysis, he opined that Phillip had a "permitted" left-hand turn, meaning McGuire would have had the same green light as Phillip and Phillip was required to "yield the right of way to oncoming traffic." He reported his findings in a written report in September 2020 and responded to Officer Sanchez's findings in a supplemental report in October 2021.

¶ 32    On cross-examination, Cannon made an "assumption" about the color of the light based on Phillip's initial statement to police that there were no other vehicles in front of him, he remembered slowing down to make the turn, he never remembered seeing a red light, and he "stated in every interview that he had the green arrow." Cannon never contacted Phillip or McGuire to speak with them before forming his conclusion.

¶ 33    Michael DiTallo, Cannon's business partner, also testified for McGuire as an expert in the field of crash investigation reconstruction. As part of his analysis, DiTallo considered Phillip's statements "that he had a green arrow; that he didn't remember if he stopped at all for a red light." DiTallo issued his initial report in September 2020, concluding: (1) "the traffic signals for northbound and southbound 80th Avenue were most likely displaying a solid green ball at the time of the crash"; (2) "the left turn signal for southbound 80th Avenue was most likely not displaying a green turn arrow"; (3) McGuire's blood alcohol content "was reported to be 0.223 which is over the legal limit of 0.08"; (4) "this crash was not avoidable for the average driver, including McGuire"; and (5) "this collision occurred because of [Phillip] turning left in front of McGuire."

¶ 34    DiTallo testified that he assessed "perception response time" to determine if "this collision [was] avoidable or not." DiTallo calculated that the "average response" time in a similar situation is 2.1 seconds. Defense counsel asked DiTallo, "Did you come to any conclusions with respect to Mr. McGuire's perception response time as he faced the Reyes vehicle turning left?" The trial court

sustained the State's objection, stating, "You can ask the question on what an average driver would do. You cannot ask the question on what Mr. McGuire's response time was unless [DiTallo] can testify *** how he would know Mr. McGuire's response time." Defense counsel asked, "How much time did Mr. McGuire have to react? Can you tell us that?" The State objected, and the trial court ruled, "If he can answer it, go ahead." In response, defense counsel withdrew the question.

¶ 35　　After Sanchez issued her supplemental report in October 2021, DiTallo wrote a second report refuting her finding. DiTallo did not change his original opinions after considering Sanchez's supplemental report. On cross-examination, DiTallo acknowledged that alcohol "can increase detection time," impair judgment, and affect vision and attention span. DiTallo admitted that the average driver response time of 2.1 seconds did not take into account McGuire's blood alcohol concentration.

¶ 36　　Following DiTallo's testimony and outside the presence of the jury, defense counsel made an "offer of proof" that, if allowed, DiTallo would testify that "based upon his analysis, this crash was not avoidable for the average driver, including McGuire." The court clarified that "the part of the question that was objectionable was the 'including McGuire.' He certainly couldn't make a determination if McGuire was an average or not average driver that day" and noted that "certainly we probably wouldn't consider, on the facts and evidence in this case, McGuire an average driver" because of the evidence of his blood alcohol concentration. The court held it was "up to the jury to determine if McGuire could have avoided the accident."

¶ 37　　The jury found McGuire guilty of aggravated driving under the influence of alcohol. The trial court sentenced McGuire to 90 months' imprisonment.

¶ 38　　　　　　　　　　　　　　II. ANALYSIS

¶ 39　　On appeal, McGuire argues: (1) the trial court erred in denying his pretrial motion to quash arrest and suppress evidence; (2) the State violated its discovery obligations and the trial court

erred in denying his motion to bar the testimony of Phillip Reyes as a sanction; (3) the trial court erred in "limiting" the expert testimony of Michael DiTallo; and (4) the trial court "abandoned the role of a neutral arbiter" and "demonstrated antagonism" towards the defense throughout trial.

¶ 40                    A. Motion to Quash Arrest and Suppress Evidence

¶ 41        McGuire argues the trial court erred in denying his motion to quash arrest and suppress evidence because there was no probable cause to arrest him, police did not have a search warrant for the blood draws, he did not consent to the blood draws, and exigent circumstances did not exist to support warrantless searches. In response, the State maintains that the medical blood draw was conducted by a private entity and was not a government action so the fourth amendment is not implicated. Also, McGuire consented to the police blood draw and a warrantless blood draw was permitted because of the circumstances. Alternatively, the admission of the police blood draw was harmless.

¶ 42        At a hearing on a motion to quash arrest and suppress evidence, the defendant bears the burden of proof to make a *prima facie* case that the evidence was obtained in an illegal search or seizure. *People v. Cregan*, 2014 IL 113600, ¶ 23. If the defendant satisfies this burden, "the burden shifts to the State to provide evidence to counter the defendant's *prima facie* case." *Id*. However, "the ultimate burden remains with the defendant." *Id*. When reviewing the trial court's ruling on a motion to quash arrest and suppress, reviewing courts apply a two-part standard of review. *People v. Almond*, 2015 IL 113817, ¶ 55. We afford great deference to the trial court's findings of fact and will reverse those findings only when they are against the manifest weight of the evidence. *People v. Manzo*, 2018 IL 122761, ¶ 25. We review *de novo* the trial court's ultimate legal ruling on whether the evidence should be suppressed. *Almond*, 2015 IL 113817, ¶ 55. It has been clearly settled that when reviewing the trial court's ruling, we "may consider evidence adduced at trial as well as at the suppression hearing." *People v. Richardson*, 234 Ill. 2d 233, 252 (2009).

¶ 43                                                    1. *Seizure*

¶ 44          McGuire contends he was "seized" within the meaning of the fourth amendment when Officers Rockaitis and London "grabbed [him] by both arms and forcibly put him on the ambulance cot." He argues that this seizure was not based on probable cause and, therefore, the trial court erred in denying his motion to quash arrest and suppress evidence. The State maintains that McGuire was not arrested until he was at the hospital, and that any police action before then was "part of a continued investigation where an arrest was possible, but defendant's medical care was the priority." We agree.

¶ 45          Not every encounter between a police officer and a private citizen involves a seizure or restraint of liberty that implicates the fourth amendment. *People v. Luedemann,* 222 Ill. 2d 530, 544 (2006). "Because the fourth amendment is not implicated until a seizure occurs, our first inquiry is to determine when defendant was seized." *People v. McMichaels*, 2019 IL App (1st) 163053, ¶ 16. Under the fourth amendment, "an individual is seized when an officer by means of physical force or show of authority, has in some way restrained the liberty of a citizen." (Internal quotation marks omitted.) *People v. Harris*, 228 Ill. 2d 222, 246 (2008). In considering whether a seizure occurred, courts consider: (1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person; or (4) using language or tone of voice compelling the individual to comply with the officer's requests. See *People v. Mendenhall,* 446 U.S. 544, 554 (U.S. 1980).

¶ 46          The evidence establishes that the paramedics, not the police officers, decided that McGuire required medical treatment and would need to be transported to the hospital based on his injury and inability to answer questions completely. There was a standing order for the paramedics that "if somebody appears confused or can't answer all of our questions appropriately, they cannot refuse medical care." McGuire was uncooperative, could not stand on his own, and refused to get

into the ambulance by himself. Police officers assisted the paramedics with getting McGuire into the ambulance when they decided to transport him to the hospital for treatment. Rockaitis did not arrest McGuire at the scene but decided to follow him to the hospital "[t]o further investigate the crash and determine if a DUI would be appropriate." Rockaitis explained that he followed the ambulance with his squad car lights on because the ambulance also had its lights activated. Rockaitis read the "Warning to Motorist" and informed McGuire that he was under arrest at approximately 10:55 p.m. Up until then, the priority was getting McGuire medical treatment for his head and hand. Under these circumstances, where McGuire had visible injuries, was not fully coherent, and was unable to refuse medical care according to the paramedics' protocol, we find that the trial court did not err in finding that McGuire was not "seized" for fourth amendment purposes until he was placed under arrest at the hospital.

¶ 47                                                  2. *Medical Blood Draw*

¶ 48            A blood draw is a search within the meaning of the fourth amendment. *People v. Brooks*, 2017 IL 121413, ¶ 27. A search conducted without a warrant is considered *per se* unreasonable under the fourth amendment unless it falls within one of a limited number of exceptions to the warrant requirement. *People v. Pitman*, 211 Ill. 2d 502, 513 (2004). It is undisputed that no warrants were issued for either the medical or police blood draws of McGuire.

¶ 49            The fourth amendment's "proscription against unreasonable searches and seizures does not apply to searches or seizures conducted by private individuals." *People v. Heflin*, 71 Ill. 2d 525, 539 (1978). A search conducted by a private actor may nonetheless implicate the fourth amendment "when the individual conducting the search can be regarded as acting as an agent or instrument of the State 'in light of all the circumstances of the case.'" *Id.* (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971)). "Participation by the police in and of itself, then, does not automatically invoke the application of the guarantees against unreasonable government intrusions

safeguarded by the fourth and fourteenth amendments." *Id.* at 539-40.

¶ 50    McGuire failed to establish that the hospital, or any of the individuals working for them, acted as agents of the government when obtaining the medical blood draw. In fact, the record supports a contrary conclusion. After examining and observing McGuire, Dr. Margaritis ordered the medical blood draw at approximately 11:05 p.m. She explained that a draw was "always order[ed]" when a patient was involved in a motor vehicle accident to rule out intoxication and look for "another etiology" to explain the patient's "altered" condition. Dr. Margaritis and paramedic Paxson explained that police officers had no say in determining the course of medical treatment. There was no evidence that the police were involved in the decision to order the medical blood draw. For these reasons McGuire failed to make a *prima facie* case that the medical blood draw violated his fourth amendment protections.

¶ 51                              3. *Police Blood Draw*

¶ 52    McGuire also asserts that the results of the police blood draw should have been suppressed because he did not consent to testing of his blood, the police did not have a warrant for the testing, and no exigent circumstances were present that would have prevented the police from obtaining a warrant.

¶ 53    Voluntary consent is a recognized exception to the warrant requirement. *People v. Anthony*, 198 Ill. 2d 194, 202 (2001). The validity of a consent search depends on the voluntariness of the consent. *Id*. Consent must be received, not extracted "by explicit or implicit means, by implied threat or covert force." *Id.* (quoting *Schneckloth v Bustamonte,* 412 U.S. 218, 228 (1973)). The voluntariness of the consent is a question of fact determined from the totality of the circumstances, and the State bears the burden of proving the consent was truly voluntary. *People v. White,* 117 Ill. 2d 194, 221 (1987). Factors to be considered in determining the voluntariness of consent include: "the time of the arrest, the use of force, whether 'the police used the custody to make *repeated*

requests for consent, and * * * [whether] the custody was used as leverage, in the sense that the arrestee was told he would be released if he gave consent.'" (Emphasis in original) *People v. Harris*, 2015 IL App (4th) 140696, ¶ 49 (quoting *People v. Alvarado,* 268 Ill. App. 3d 459, 467 (1994)).

¶ 54    In this case, there is no indication that Rockaitis repeatedly requested McGuire submit to a blood test or used undue influence or force to obtain his consent. When Rockaitis advised McGuire that he needed to get blood and urine from him, McGuire said, "Yeah." Rockaitis also read McGuire the Warning to Motorist, which informed him that he had the option to refuse the test and the consequences for refusing that test. Consent to a chemical test "is not coerced and is not rendered involuntary merely by a law-enforcement officer's reading of the warning to motorist." *Harris*, 2015 IL App 140696, ¶ 50. Based on the totality of the circumstances, we find McGuire had a choice whether to consent to the testing, was advised of the effects of that choice, and voluntarily consented to the blood draw. As such, the consensual police blood draw did not violate McGuire's fourth amendment rights.

¶ 55    In addition, section 11-501.2(c) of the Code "sets forth a scenario in which warrantless testing will almost always be constitutional" in light of exigent circumstances. *People v. Eubanks*, 2019 IL 123525, ¶ 59 (citing 625 ILCS 5/11-501.2(c)). While "the determination of exigent circumstances requires a totality-of-the-circumstances approach, courts may identify 'general rules' that will apply in most cases." *Id.* (citing *Mitchell v. Wisconsin*, 588 U.S. 840 (2019)). One of these "general rules" is that "exigency will exist when BAC is dissipating and 'some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application.'" *Id.* (quoting *Mitchell*, 588 U.S. at 854). Here, Rockaitis testified McGuire's BAC was dissipating and officers had probable cause to believe McGuire was under the influence of alcohol and was driving a vehicle that caused death or personal injury to another person. Based on

the totality of the circumstances, as well as the general rule applicable to this case, the police blood draw did not violate McGuire's fourth amendment rights. We affirm the denial of his motion to suppress.

¶ 56                                B. Allegation of Discovery Violations

¶ 57        Next, McGuire argues that the State violated its discovery obligation in "failing to disclose certain statements of [Phillip] Reyes." As a result, the trial court erred in denying his motion to bar certain testimony from Reyes or continue the trial. We disagree. The trial court did not abuse its discretion in finding no discovery violation occurred and declining to impose sanctions.

¶ 58        Discovery in criminal cases is governed by Illinois Supreme Court Rule 412, which requires the State to disclose "the names and last known addresses of persons whom the State intends to call as witnesses, together with their relevant written or recorded statements, memorandum containing substantially verbatim reports of their oral statements and a list of memoranda reporting or summarizing their oral statements." Ill. S. Ct. R. 412(a)(i) (eff. Mar. 1, 2001). Additionally, under Rule 415(b), the State has a continuing duty to disclose "additional material or information which is subject to disclosure" when it becomes aware of such information. Ill. S. Ct. R. 415(b) (eff. Oct. 23, 2020). "The purpose of the discovery provision is to afford the accused protection against surprise, unfairness and inadequate preparation." *People v. Robinson*, 157 Ill. 2d 68, 79 (1993). A court must first determine whether a discovery violation has occurred before it may impose any sanction which, in its discretion, it deems just. *People v. Koutsakis*, 255 Ill. App. 3d 306, 312 (1993). The proper sanction to be applied is a decision appropriately left to the discretion of the trial court, and we review the trial court's decision for an abuse of discretion. *People v. Kladis*, 2011 IL 110920, ¶ 42.

¶ 59        In this case, the "new" disclosure was Phillip's statements to ASAs at around 2:30 p.m. on January 27, 2023, three days before trial was scheduled to begin. Approximately an hour and a

half later, at 3:57 p.m., the State emailed to defense counsel a disclosure summarizing the interview. Given the rapidity of the State's disclosure, McGuire has not shown that a discovery violation occurred or that the State exhibited any bad faith. See, *e.g.*, *People v. Robinson*, 226 Ill. App. 3d 649, 658 (1992) (no discovery violation where prosecution disclosed statement upon learning the relevant information).

¶ 60   McGuire also has not shown he was prejudiced by the timing of the State's disclosure. The State's summary of Phillip's statement noted that he stopped at a red light at the intersection before the accident and waited until the light turned green with a green left turn arrow before proceeding into the intersection. This was the same conclusion that Officer Sanchez reached over a year earlier in her October 4, 2021, supplemental report based on crash data and surveillance video analysis. DiTallo acknowledged that after he received Sanchez's supplemental report, he wrote a second report arguing that her conclusion was incorrect. McGuire was not prejudiced or "surprised" by information he had already received and provided to his experts to refute. See, *e.g.*, *People v. Lee*, 256 Ill. App. 3d 856, 864 (1993) (no prejudice by failure to disclose defendant's alleged statement because it was unlikely prior notice could have helped the defense discredit the evidence and the other evidence of defendant's guilt remained overwhelming).

¶ 61   The record reflects that the trial court considered the option of a continuance, but ultimately found that there were not "any legal grounds for that." The trial judge noted that the case was five years old and explained that witnesses' "testimony is altered to some degree, sometimes there's good reasons for that. Sometimes there's not good reasons for that. And that's what both sides have a right to question the witness about." The trial judge reiterated that the defense would have the opportunity to cross-examine Phillip about his statements and gave the defense the opportunity to discuss his new statement with its expert witnesses and inform the court if "it changes anything." We find that the trial court did not abuse its discretion in denying a continuance and allowing

McGuire to explore the new statement with his expert and cross examine Phillip on the stand.

¶ 62       McGuire also argues that State also committed a discovery violation when they did not disclose the substance of Phillip's statement to ASAs in September or October 2022. However, Phillip's statement, which was consistent with his previous statements to law enforcement and not memorialized verbatim, was not required to be disclosed under Rule 412(a)(i).

¶ 63       Illustrative of the requirements of Rule 412(a)(i) is *People v. Mahaffey*, 128 Ill. 2d 388 (1989), where the codefendants were convicted of murder and attempted murder. On appeal, one of the codefendants contended that the trial court erred in admitting the 11-year-old surviving victim's in-court identification of him because the defense did not receive any discovery from the State indicating that someone would be able to identify him as one of the perpetrators of the crimes. *Id.* at 417. In support, the codefendant asserted that, a month before trial, the 11-year-old had a conversation with an Assistant State's Attorney where he told the Assistant State's Attorney that "he was '99 per cent [*sic*] sure' he could identify [the codefendants] as the perpetrators." *Id.* at 417-18. The codefendant argued that the State was required to disclose this oral statement. *Id.* at 418.

¶ 64       In analyzing the codefendant's claim of error, our supreme court reviewed the language of Rule 412(a)(i). *Mahaffey*, 128 Ill. 2d at 418. The court concluded it was "clear that the State is required to disclose a witness' oral statements *only* if they are in 'memoranda containing substantially verbatim reports of their oral statements.'" (Emphasis added) *Id.* (quoting Ill. S. Ct. R. 412(a)(i)). The court highlighted that the parties agreed that the 11-year-old's statement had never been memorialized; therefore, it appeared the State had not committed a discovery violation. *Id.* Moreover, there was no evidence the State acted in bad faith or intentionally did not memorialize a statement to prevent disclosure. *Id.* As such, the State did not violate Rule 412(a)(i). *Id.* at 419.

¶ 65      Similarly, the record in this case shows that the State did not memorialize Phillip's verbatim statement and there is no indicia of bad faith. An ASA interviewed Phillip with another ASA present as a "prover," but the statement was not memorialized and did not differ from Phillip's prior statements McGuire already had. The trial court recognized: "Witnesses are prepped every single day. Would they have to tender every single prep of *** every single witness that they talked to *** when they are saying consistent statements with what they said before? The answer is no, the State would not have to do that." Accordingly, the State was under no obligation to tender an oral statement that was not memorialized and provided no new or additional information from Phillip's previous statements.

¶ 66                        C. Testimony of Michael DiTallo

¶ 67      McGuire also argues the trial court abused its discretion in "excluding certain testimony" from Michael DiTallo, his expert in crash investigation reconstruction. According to McGuire, DiTallo's testimony would have been "relevant to whether [d]efendant's impairment due to alcohol was the proximate cause of the collision resulting in death."

¶ 68      A criminal defendant has the right to present witnesses in his own defense. *People v. Lerma*, 2016 IL 118496, ¶ 23. Expert testimony is only necessary where the subject of the testimony is particularly within the witness's experience and qualifications and beyond that of the average juror. *Id.* A trial court's decision to exclude or admit expert testimony is reviewed under the abuse of discretion standard. *Id.* In exercising its discretion, "the trial court should carefully consider the necessity and relevance of the expert testimony in light of the particular facts of the case before admitting that testimony for the jury's consideration." *Id.* ¶ 23.

¶ 69      In this case, DiTallo testified that the "average response" time to seeing Phillip's left-hand turn would be 2.1 seconds, which meant that 50 percent of people would react faster than 2.1 seconds and the other 50 percent would react slower, with the lowest 15 percent of the "worst"

drivers having a reaction time of 2.9 seconds. He concluded that an "average" driver would have no time to brake when faced with a vehicle turning left in front of them. Therefore, "this collision was not avoidable with a left-turning vehicle and the response times that are involved."

¶ 70 When defense counsel asked about McGuire's own response time, the State objected, arguing, "He can't speak to McGuire's perception response time, he can speak to the response time of the average driver." The trial court sustained the objection and later explained that "the part of the question that was objectionable was the 'including McGuire.' He certainly couldn't make a determination if McGuire was an average or not average driver that day. *** And certainly we probably wouldn't consider, on the facts and evidence in this case, McGuire an average driver that day" because of the evidence of his blood alcohol concentration. In denying McGuire's motion for new trial, the trial court noted, "This was in the jury's province to make the determination on how this accident occurred" and an expert could not testify "what the Defendant could or could not have done at that time with giving no test whatsoever to the Defendant."

¶ 71 The trial court did not abuse its discretion in barring DiTallo from testifying about McGuire's response time compared with the "average" response time in the absence of evidence that he had specifically analyzed or tested McGuire. McGuire's condition, and whether he could be considered an "average" person the night of the accident, was clearly a function of the jury. The trial court gave defense counsel the opportunity to "ask questions to lay that foundation on how he would know McGuire's response time" in relation to the "average" response time, but defense counsel chose to withdraw the question instead. We find that the trial court's decision was not unreasonable or arbitrary and does not amount to an abuse of discretion.

¶ 72                    D. Allegation of Judicial Impropriety

¶ 73 Finally, McGuire argues that the trial court "abandoned the role of a neutral arbiter and demonstrated antagonism towards the defense of the case and defense counsel" throughout the

trial and, as a result, he is entitled to a new trial. In support, McGuire points to several evidentiary rulings and comments made by the trial judge outside the presence of the jury. However, these occurrences do not, alone or cumulatively, demonstrate that McGuire was deprived of the due process of law.

¶ 74     A defendant has the right, under the due process clause, to an impartial and disinterested tribunal. *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). This disinterested tribunal "preserves both the appearance and reality of fairness." *Id.* "A trial judge is presumed to be impartial, and the burden of overcoming this presumption rests on the party making the charge of prejudice." *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002). Allegations of judicial bias or prejudice must be viewed in context and should be evaluated in terms of the judge's specific reaction to the events taking place. *People v Faria*, 402 Ill. App. 3d 475, 482 (2010). "To conclude that a judge is disqualified because of prejudice is not, of course, a judgment to be lightly made." *People v. Vance,* 76 Ill.2d 171, 179 (1979).

¶ 75     In this case, McGuire points to numerous evidentiary rulings made during trial, including sustaining objections by the State and telling the jury to disregard certain statements. However, "[a] judge's rulings alone almost never constitute a valid basis for a claim of judicial bias or partiality." *Eychaner*, 202 Ill. 2d at 280. Furthermore, "[a]llegedly erroneous findings and rulings by the trial court are insufficient reasons to believe that the court has a personal bias for or against a litigant." *Id*. Here, the trial judge sustained and overruled objections made by both the State and defense throughout trial. When objections were sustained, the judge properly instructed the jury to disregard comments and any answers that may have been given. The court did so in a neutral, matter-of-fact way with statements like, "disregard that comment" and "disregard the question and any answer that may have been given." McGuire has not shown any antagonism or imbalance by the court that would support a finding of judicial bias or partiality.

¶ 76    McGuire also asserts that the trial judge demonstrated judicial bias by "limit[ing]" cross-examination by defense counsel. A trial judge has a duty to control and expedite the trial proceedings and has wide discretion in doing so. See, *e.g.*, *People v. Long*, 39 Ill. 2d 40, 42 (1968). Placing limits on a party's examination is part of that discretion. See, *e.g.*, *In re W.D.*, 194 Ill. App. 3d 686, 702 (1990). In this case, the trial court did not abuse its discretion in instructing defense counsel to "move on" after sustaining objections to the line of questioning he was pursuing.

¶ 77    Finally, we reject McGuire's argument that the trial judge "assum[ed] the role of prosecutor" by asking a clarifying question of the testifying witness. The trial judge has discretion to raise objections and question witnesses. *People v. Wiggins*, 2015 IL App (1st) 133033, ¶ 46 (citing *People v. Marino*, 414 Ill. 445, 450 (1953)). In doing so, the trial judge "must not invade the province of the jury by making comments, insinuations or suggestions indicative of belief or disbelief in the integrity or credibility of a witness." *Marino*, 414 Ill. at 450.

¶ 78    In this case, Phillip testified that during the 2022 interview, an Assistant State's Attorney "was writing some things down." When defense counsel asked, "And it was all about the accident at hand, is that true?" the State objected. The trial judge asked Phillip, "Sir, could you see what he was writing?" Phillip acknowledged that he could not see what the Assistant State's Attorney was writing and the trial judge sustained the objection. The trial court's question did not invade the province of the jury but was pertinent to the ruling on the State's objection.

¶ 79    It is apparent from the record that the court conducted itself in an impartial and fair manner during the defendant's trial. Nothing about the court's actions indicate that it abandoned its role as a neutral arbiter or advocated for the State.

¶ 80                                    III. CONCLUSION

¶ 81    For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 82    Affirmed.